STATE on the Relation of BERT H. MILLER, Attorney
General, Appellant, v. STATE BOARD OF EDUCA-
TION and BOARD OF REGENTS OF THE UNIVER-
SITY OF IDAHO et al., Respondents.

[52 Pac. (2d) 141.]

Bert H. Miller, Attorney General, and Ariel L. Crowley, Assistant Attorney General, for Appellant.

Verner R. Clements and Murray Estes, for Respondents.

AILSHIE, J.—This proceeding was instituted in the district court by the state of Idaho on relation of the Attorney General, under the *Uniform Declaratory Judgment Act* (chap. 70, 1933 Sess. Laws), for the purpose of procuring a judgment declaring the validity or invalidity of chapter 55, First Extraordinary Session, Laws 1935.

The district court sustained the act and the state has appealed.

It appears that there are some 2,300 students enrolled at the University of Idaho; that the only hospital facilities they have are in an old residence building, in which about fifteen beds are available for use of students; and that there exists an emergency for an infirmary and hospital facilities. The State Board of Education and Board of Regents of the University proposed to enter into a contract with the United States, whereby the government will grant to the University for construction of an infirmary, as a relief project, $49,682 as a gift and $68,500 on a 30-year amortized loan; and that the loan shall be repaid to the government from gross revenues accruing from the operation of the infirmary to be constructed by the use of such funds, and the income from the dormitory known as Lindley Hall.

It is also alleged by the Attorney General as relator, "that the pledging of the gross revenues from the infirmary contemplated by said defendants, as hereinafter set forth, will necessitate the expenditure of large sums of money by way

of administrative and maintenance expense from general legislative appropriations to be made from the treasury of the State of Idaho, during the term of such assignment'' (of revenues pledged).

It is also alleged that Lindley Hall is one of the established and existing dormitories of the University of Idaho, and is owned by the defendant corporation (State Board of Education and Board of Regents of the University of Idaho) ; and that no liens or encumbrances exist against the same; that this hall or dormitory was not purchased or procured by state or federal funds but was a gift to the Regents from popular subscription and donated to the Regents for the use of students; and that the title thereto is in defendant corporation (Board of Regents).

Although a considerable number of questions were submitted to and passed upon by the trial court, it is suggested by the briefs of both parties that there are really only three questions properly or necessarily involved and here presented for decision, namely :

1. Is chapter 55, First Extra. Sess. 1935, properly embraced within the call of the Governor for the special session ?

2. Does the act (chap. 55, First Extra. Sess. 1935) conflict with sec. 3, art. 8 of the state Constitution, and particularly in so far as it authorizes the Board of Regents of the University of Idaho as a corporation to issue bonds to be amortized over a period of 30 years from revenues accruing from the operation of the proposed infirmary ?

3. If the act is valid, does it authorize the application of gross or only net revenues accruing from the operation of the proposed infirmary; and may the regents also pledge the income from dormitories otherwise unencumbered?

First: The proclamation of the Governor issued on the 8th day of March, 1935, calling the legislature into extraordinary session, stated, among other things, the following object of the session :

''For the purpose of considering and enacting such laws as may be deemed advisable or necessary to enable the State of Idaho or any subdivision thereof or therein to fully cooperate with the government of the United States or any of

the departments or agencies thereof, in matters relating to planning boards, emergency relief or employment, . . . . ''

We hold that the act in question (chap. 55, First Extra. Sess. 1935) is clearly within the provisions of the call and consequently the answer to the first question is in the affirmative. (*Brewer v. City of Point Pleasant,* 114 W. Va. 572, 172 S. E. 717; *In re Senate Resolution No. 2,* 94 Colo. 101, 31 Pac. (2d) 325; *State Note Board v. State,* 186 Ark. 605, 54 S. W. (2d) 696; *In re Governor's Proclamation,* 19 Colo. 333, 35 Pac. 530.)

■ Second: The answer to the second question is in the negative. Art. 8 of the Constitution is devoted to ''Public Indebtedness and Subsidies'' and sec. 3 thereof is dealing specifically with ''Limitations on County and Municipal Indebtedness'' and provides as follows:

''No county, city, town, township, board of education, or school district, or other subdivision of the state, shall incur any indebtedness, or liability, in any manner, or for any purpose, exceeding in that year, the income and revenue provided for it for such year, without the assent of two-thirds of the qualified electors thereof voting at an election to be held for that purpose, nor unless, before or at the time of incurring such indebtedness, provision shall be made for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also to constitute a sinking fund for the payment of the principal thereof, within twenty years from the time of contracting the same. Any indebtedness or liability incurred contrary to this provision shall be void: provided, that this section shall not be construed to apply to the ordinary and necessary expenses authorized by the general laws of the state.''

The ''State Board of Education and Board of Regents of the University of Idaho'' is the constitutional and statutory successor (House Joint Resolution No. 30, 1911 Sess. Laws, p. 791; chap. 77, 1913 Sess. Laws; sec. 32–103, ICA) of the original territorial board of ''Regents of the University of Idaho'' (15th Territorial Sess. Laws 17; sec. 10, art. 9, Const.). At the same time and by the same organic charter that adopted sec. 3, art. 8 of the Constitution, the independent,

separate, corporate existence of the Territorial Board of Regents was recognized, approved and confirmed. (Sec. 10, art. 9, Const.)

Had it been intended by the framers of the Constitution to place the same limitations and restrictions on "the Regents of the University of Idaho" as a corporation that were placed on counties, cities, towns and other municipal corporations by sec. 3, art. 8, they would have undoubtedly incorporated in this section (sec. 3, art. 8) the name of the Regents of the University, and placed the Board of Regents among the inhibited classes specified.

There is another reason why it is evident to us that it was not intended for this section (3 of art. 8) to include the Regents of the University, and that is: The Regents have not and never had any taxing power; they could not levy or collect taxes of any kind and were not and are not representatives of any municipality, territory, subdivision or taxing unit of the state in any respect. They are merely the managers and corporate representative of an educational institution which is dependent wholly on state and federal appropriations and donations for its finances and operating expenses. The Regents so recognized by the Constitution as a corporate entity were acting and were intended to act as an instrumentality of the state for the purpose of advancing the education of the youth of the state.

Third: Addressing ourselves to the third question, we find it of a more complex and doubtful character. The "income" to be pledged must necessarily mean net income; otherwise it would amount to incurring a *state liability*, for the reason that if the entire *gross receipts* from the operation of the proposed building as well as Lindley Hall can be hypothecated for the payment of such bond issue, it will entail the use of state funds or subsequent state appropriations in considerable sums to defray the overhead and operating expenses. On the other hand, the act declares:

"Such bonds shall not constitute a debt, legal or moral, of the State of Idaho, shall so recite on their face, and shall not be enforceable out of any funds of the institution issuing

said bonds other than the income and revenues pledged and assigned to, or in trust for the benefit of, the holder or holders of such bonds.''

Furthermore, the word ''income,'' in common parlance, is generally understood, as ''gain or profit'' (Webster's New Internatl. Dictionary; *In re Redding,* (1897) 1 Ch. 876, 879; *Lawless v. Sullivan,* (1881) 6 App. Cas. 373, 378); and it was evidently not thought by the legislature to mean *gross receipts.* To so hold would run counter to the declared purpose of the act to create *no* ''*legal or moral*'' *obligation against the state.*

It follows that this branch of the third question must be answered that: it means *net income* remaining after payment of operating expenses. The same answer will apply to Lindley Hall. That appears to be the only building owned by the defendant Board of Education and Board of Regents in their corporate capacity that was not acquired by state or federal appropriation. It appears, therefore, that the *net income* from these buildings may properly be pledged to the payment of the proposed loan.

Whatever indebtedness may be incurred or bonds issued under the authority of this act (chap. 55, First Extra. Sess. 1935) may be made a lien on the net income of the proposed infirmary and Lindley Hall, but cannot in any manner or form become a charge against, or obligation of, the state of Idaho; nor will the state be under any ''legal or moral'' obligation to appropriate anything whatever therefor; ''nor shall payment thereof be enforceable out of any funds of the institution issuing said bonds other than the income and revenues pledged and assigned.'' (*State v. State Board of Education,* 33 Ida. 415, 196 Pac. 201.)

The foregoing discussion disposes of the essential and material portions of the judgment brought up by this appeal. Other answers therein contained, not subsidiary to and covered by this opinion, are thought to be only responses to moot and hypothetical questions, not properly invoking the judicial function and not sufficiently real or substantial on which to predicate a judgment. (Sec. 6, Declar. Act.)

■ Although the state has brought this case here on appeal, we have been confronted with the unusual and extraordinary situation of both appellant and respondents taking the same position in urging the validity of the act and the correctness of the judgment of the trial court. Notwithstanding the fact that no one raises the question of procedure here, and both parties are seeking a review of the case in this court, we feel constrained to announce, as a warning to future litigants, that the assumption of jurisdiction in this case shall not be taken as a precedent for future cases. It is only what seems to be the public importance of the matters involved and the exigencies of the situation that have induced us to consider this appeal.

No reason or argument is advanced to the effect that the act (chap. 55, 1935 First Extra. Sess.) is not embraced in the call of the Governor for the extraordinary session; nor is it contended by anyone that the act is in conflict with any other specific provision of the Constitution, either state or federal. It is true that the affirmative is urged by both sides, i. e., that the act is valid and does not violate any constitutional provision. We are consequently invited to examine and pass upon the whole range of constitutional law, both state and national, to ascertain for ourselves whether the act so submitted to judicial scrutiny is in *any* respect open to valid constitutional objection. This situation illustrates the unwisdom of courts entertaining "friendly actions."

■ The Declaratory Judgment Act (chap. 70, 1933 Sess. Laws) contemplates some specific adversary question or contention based on an existing state of facts, out of which the alleged "rights, status and other legal relations" arise, upon which the court may predicate a judgment "either affirmative or negative in form and effect." (Sec. 1 of Declaratory Act.)

The questioned "right" or "status" may invoke either remedial or preventive relief; it may relate to a right that has either been breached or is only yet in dispute or a status undisturbed but threatened or endangered; but, in either or any event, it must involve actual and existing facts. (*Heller*

*v. Shapiro,* 208 Wis. 310, 242 N. W. 174, 87 A. L. R. 1201; *Kariher's Petition No. 1,* 284 Pa. St. 455, 131 Atl. 265; *Hunt-Forbes Const. Co. v. City of Ashland,* 250 Ky. 41, 61 S. W. (2d) 873; *Greene v. Riordan,* 97 Cal. App. 462, 276 Pac. 141; *Morton v. Pacific Const. Co.,* 36 Ariz. 97, 283 Pac. 281; *Poore v. Poore,* 201 N. C. 791, 161 S. E. 532; *Nashville C. & St. L. R. Co. v. Wallace,* 288 U. S. 249, 53 Sup. Ct. 345, 77 L. ed. 730, 87 A. L. R. 1191; vol. 31 (No. 2) Mich. Law Review (1932), 180.)

The judgment is affirmed in the particulars and respects herein stated and in other respects it is held to be moot and advisory on questions not yet justiciable. No costs awarded.

Givens, C. J., and Budge and Morgan, JJ., concur.

HOLDEN, J., Concurring Specially.—June 16, 1933, an act of the Congress of the United States was approved, entitled: "An Act to encourage national industrial recovery, to foster fair competition and to provide for the construction of certain useful public works and for other purposes," generally known as the National Recovery Act. April 1, 1935, an act of the First Extraordinary Session of the state legislature was approved, entitled: "An Act to constitute and confirm certain educational institutions of the state as separate legal entities; to confer powers upon such educational institutions, including the powers to purchase, construct, better, and equip buildings and to make other improvements to their plants, and for such purposes to borrow money and accept grants from any federal agency; to issue bonds and to provide for the payment of such bonds and interest thereon and to secure such payment; to confer further powers for the making of agreements with the holders of such bonds; to supersede inconsistent provisions of all other laws; and to declare an emergency." (Chap. 55, 1935 First Extraordinary Session Laws.)

Chapter 55, *supra,* was enacted for the purpose of enabling and authorizing certain educational institutions of the state "To accept grants of money or materials or property of any kind from a federal agency, upon such terms and conditions

as such federal agency may impose," and "to obtain loans or grants or both from any federal agency" for the purposes stated in the statute.

Respondents desire to construct an infirmary and to that end propose to enter into a contract with the United States whereby the federal government will grant to the State University for the construction of an infirmary, as a relief project, $49,682 as a gift and $68,500 on a thirty-year amortized loan.

Grave uncertainties existing as to the right of the respondents to enter into the proposed contract, this action was commenced under the "Uniform Declaratory Judgment Act" (chap. 70, 1933 Session Laws), for the purpose of procuring a declaration of construction and validity of chapter 55, *supra.*

The Uniform Declaratory Judgment Act was enacted for the express purpose of removing just such substantial uncertainties as confronted the respondents. "Its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations, and it is to be liberally construed and administered," declared the legislature by section 12 thereof. But for the enactment of the Uniform Declaratory Judgment Act, the respondents would have been compelled to first enter into the proposed contract, and to incur considerable expense in connection therewith, and then and thereafter (the right to enter into the contract being challenged) have the courts determine whether the contract was valid or invalid. In other words, the respondents would have been compelled to take a step in the dark. Put in the language of Congressman Gilbert, as quoted in Borchard on Declaratory Judgments, p. 42: "Under the present law you take a step in the dark and then turn on the light to see if you stepped into a hole. Under the declaratory judgment law you turn on the light and then take the step." Or as observed by Chief Justice Peasley in *Faulkner v. Keene*, 85 N. H. 147, 155, 155 Atl. 195, 200: "The court does not have to say to the prospective victim that the only way to determine whether the suspect is a mushroom or a toadstool is to eat it."

In conclusion: The proposed contract may be lawfully entered into by respondents, and the judgment of the trial court in the case at bar ought to be affirmed in the particulars stated in the opinion of Justice Ailshie.