913 P.2d 1141

BOUNDARY BACKPACKERS, an unincorporated association; North Idaho Audubon Society, Inc., an Idaho corporation; Bonners Ferry Forest Watch, an unincorporated association; Jerry Pavia; Paul R. Sieracki; Will Venard; Jan Wathen; Allen H. Rose and Jan Rose, husband and wife; Laurel McGuire; Lew Langness and Linda Langness, husband and wife; John O'Connor; Shaela Conner; Cherie Bronstein; Robert Moir; David W. Bodner and Meeche Bodner, husband and wife; Dan J. Misciagna; Daniel Krmpotich and Michael S. Powers, Plaintiffs–Respondents,

v.

BOUNDARY COUNTY, a governmental subdivision; Ronald Smith, Merle Dinning and Orrin Everhart, in their official capacities as members of the Boundary County Board of Commissioners, Defendants–Appellants.

No. 21287.

Supreme Court of Idaho,
Coeur d'Alene, April 1995 Term.

March 18, 1996.

Rehearing Denied April 18, 1996.

Randall W. Day, Bonners Ferry, for appellants.

Scott Reed, Coeur d'Alene, for respondents.

Peter D. Coppelman, Washington, DC, for Amicus Curiae United States.

JOHNSON, Justice.

This case concerns a county ordinance that requires all federal and state agencies to comply with a county land use policy plan. We conclude that the ordinance violates the U.S. Constitution because federal law preempts portions of the ordinance and that the entire ordinance is invalid because these portions are not severable. We also conclude that the one individual who has standing to challenge the ordinance is not entitled to attorney fees under the private attorney general doctrine.

## I.

### THE BACKGROUND AND PRIOR PROCEEDINGS

In 1992, the Boundary County Board of Commissioners (the board) enacted an ordinance (the ordinance), entitled Boundary County Interim Land Use Policy Plan (the plan). The ordinance declares that the scope and purpose of the plan is "to guide the use of public lands and public resources in Boundary County and to protect the rights of private landowners." The ordinance directs that "all federal and state agencies shall comply with" the plan. The plan contains the following edicts to state and federal agencies:

> Federal and state agencies proposing actions that will impact [the plan] shall prepare and submit in writing, and in a timely manner, report(s) on the purposes, objectives and estimated impacts of such actions, including economic, to [the board]. These report(s) shall be provided to [the board] for review and coordination prior to federal or state initiation of action.

. . . .

Federal land agencies shall not acquire any private lands or rights in private lands within Boundary County without first assuring:

a. That as a minimum, parity in land ownership status is maintained; and

b. That private property interests are protected and enhanced.

. . . Federally managed lands that are difficult to manage or which lie in isolated tracts shall be targeted for disposal.

. . . Boundary County concurrence shall be required prior to any [federal and state land] adjustments.

. . . Boundary County shall determine land withdrawals for hazardous and non-hazardous waste storage as well as the types and points of origin of such waste.

. . . Before federal and state land agencies can change land use, adverse impact studies on uses shall be conducted and mitigation measures adopted with concurrence from Boundary County.

. . . .

. . . Any federally proposed designation of Wild and Scenic Rivers and all federal policies regarding riparian management in Boundary County shall be coordinated with [the board] and shall comply with any County water use plan.

. . . .

. . . Boundary County may develop Wild and Scenic River Designations of its own design and shall require full federal compliance in the acceptance and enforcement of such designations.

. . . .

. . . No wilderness areas shall be designated in Boundary County.

The ordinance directs enforcement of the plan: "Boundary County shall enforce compliance with [the plan] and shall monitor consistency between federal and state actions and activities and the land use requirements enumerated herein."

The board sent copies of the plan to all federal, state, and local governmental agencies, together with a form letter requesting that each agency give the board ninety days notice prior to taking any proposed actions that would affect the economic stability, custom, or culture of Boundary County (the county).

Boundary Backpackers, the North Idaho Audubon Society, and Bonners Ferry Forest Watch (the organizations) are non-profit membership groups located in the county. In 1993, the organizations and eighteen individuals (the individuals) who are residents of the county sued the county and the members of the board, seeking (1) a declaratory judgment that the ordinance is unconstitutional and void, (2) an injunction enjoining the board members from enforcing the ordinance and directing that they repeal the ordinance, (3) damages, and (4) attorney fees and costs. The organizations and the individuals alleged that the ordinance threatens their individual and collective environmental, aesthetic, and recreational interests in the state and federal lands, waters, and natural resources in the county.

The organizations and the individuals moved for summary judgment. The county and the board moved to dismiss the suit. The board members submitted an affidavit in which they stated that the board "deemed that it would not be proper to seek enforcement of the ordinance by fines or penalties." The organizations and several of the individuals submitted affidavits stating the effect the ordinance has on them.

The trial court granted summary judgment to the organizations and the individuals, ruling that one or more of them had standing and that the issues presented were ripe for review. The trial court concluded that the ordinance requires the federal government to maintain ownership parity in the disposition and acquisition of federal properties and, consequently, conflicts with article I, section 8, clause 17 of the U.S. Constitution (the Property Clause), as well as the Federal Land Policy Management Act of 1976, 43 U.S.C. § 1715(a) (1986). The trial court ruled that under article VI, clause 2 of the U.S. Constitution (the Supremacy Clause), the ordinance is preempted by federal law. The trial court also concluded that the board exceeded its authority in enacting the ordinance based upon article IX, sections 7 and 8

of the Idaho Constitution and related statutes which vest the state board of land commissioners with management authority over state lands. The trial court declared the entire ordinance void on the basis that the invalid provisions were pervasive and awarded the organizations and the individuals attorney fees under the private attorney general doctrine.

The county and the board members appealed.

## II.

## ONE OF THE INDIVIDUALS HAS STANDING.

The county and the board members assert that the trial court incorrectly determined that one or more of the organizations and individuals had standing. We disagree.

■■■ In *Miles v. Idaho Power Co.*, 116 Idaho 635, 778 P.2d 757 (1989), the Court stated three basic propositions concerning standing that guide our decision here:

1. "The doctrine of standing focuses on the party seeking relief and not on the issues the party wishes to have adjudicated."

2. "[T]o satisfy the case or controversy requirement of standing, litigants generally must allege or demonstrate an injury in fact and a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury."

3. "[A] citizen and taxpayer may not challenge a governmental enactment where the injury is one suffered alike by all citizens and taxpayers of the jurisdiction."

*Id.* at 641, 778 P.2d at 763.

In the present case, the county and the board members objected to various portions of the affidavits submitted by the organizations and the individuals concerning their standing to bring this action. The trial court sustained most of these objections, overruling only a few. We review those portions of the affidavits to which the county and the board members objected to determine whether they are admissible as required by I.R.C.P. 56(e). *Hecla Mining Co. v. Star–Morning Mining Co.*, 122 Idaho 778, 782–87,

839 P.2d 1192, 1196–1201 (1992). We agree with the trial court in sustaining most of the county's and the board members' objections. Therefore, we do not consider these portions of the affidavits in determining whether the organizations and the individuals have standing.

Considering the remaining portions of the affidavits submitted on behalf of the organizations and all but one of the individuals, they do not demonstrate an injury in fact or a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury. Likewise, with regard to the organizations and all but one of the individuals, we do not find an injury that is not suffered alike by all citizens of the county.

■■■ The affidavit of Dan Krmpotich, a commercial guide in the county, contains the following statement that establishes his standing to challenge the ordinance: "If Boundary County succeeds in enforcing the ordinance . . . , I shall lose a very substantial portion of my existing available open space usable for high quality recreation related to wildlife and wild lands." The county and the board members objected on the grounds that this statement lacked foundation, was an inadmissible opinion, and constituted speculation. There are other portions of the affidavit to which the county and the board members did not object, except to say that they were self-serving. So far as we can understand this objection, it does not render these statements inadmissible. These statements provide an ample foundation to support Krmpotich's concluding statement of the injury he will suffer from the enforcement of the ordinance. They reveal Krmpotich's reliance since 1982 on the federal and state public lands in the county as a site for professionally guiding for compensation over 200 clients. His opinion that if the county enforces the ordinance he will lose a very substantial portion of the existing available open space for this purpose qualifies as an expert opinion admissible pursuant to I.R.E. 702 and, therefore, does not constitute speculation. Krmpotich has demonstrated an injury in fact that is not one suffered alike by all citizens and taxpayers of the county and

a substantial likelihood that a declaration of the unconstitutionality of the ordinance will prevent or redress the claimed injury. Therefore, he has standing.

## III.

### THIS CASE IS RIPE FOR JUDICIAL REVIEW.

■ The county and the board members assert that this case is not ripe for judicial review. We disagree.

In *Miles*, the Court pointed out that "a declaratory judgment action must raise issues that are definite and concrete, and must involve a real and substantial controversy as opposed to an advisory opinion based upon hypothetical facts. Ripeness asks whether there is any need for court action at the present time." 116 Idaho at 642, 778 P.2d at 764. All of these conditions are met in this case. The ordinance is in place. It contains several edicts concerning the compliance of federal and state agencies with the plan and announces that "[n]o wilderness areas shall be designated in Boundary County." The ordinance proclaims: "Boundary County shall enforce compliance with [the plan]. . . ." The affidavit of the board members who enacted the ordinance stating that they "deemed that it would not be proper to seek enforcement of the ordinance by fines or penalties" does not override the terms of the ordinance requiring enforcement. We will not speculate whether the board members will choose another form of enforcement or whether a new board will choose to enforce the ordinance by fines or penalties. The ordinance requires the plan to be enforced.

In *Harris v. Cassia County*, 106 Idaho 513, 681 P.2d 988 (1984), the Court noted that the right sought to be protected by a declaratory judgment "may invoke either remedial or preventative relief; it may relate to a right that has either been breached or is only yet in dispute or a status undisturbed but threatened or endangered; but, in either or any event, it must involve actual and existing facts."

*Id.* at 516–17, 681 P.2d at 991–92 (quoting *State ex rel. Miller v. State Bd. of Educ.*, 56 Idaho 210, 217, 52 P.2d 141, 144 (1935)). In the present case, the ordinance threatens to disturb the status and management of federal and state public lands in Boundary County. The issues are definite and concrete and there is a real and substantial controversy.

## IV.

### CONGRESS HAS PREEMPTED PORTIONS OF THE ORDINANCE PLACING REQUIREMENTS ON FEDERAL AGENCIES.

The county and the board members assert that the none of the provisions of the ordinance is preempted by federal law. We disagree.

■ The power over federal land granted to Congress in the Property Clause is plenary and without limitations. *California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 580, 107 S.Ct. 1419, 1424–25, 94 L.Ed.2d 577 (1987). The Supremacy Clause invalidates state laws or local ordinances that " 'interfere with, or are contrary to,' federal law." *Hillsborough County, Fla. v. Automated Medical Labs. Inc.*, 471 U.S. 707, 712, 105 S.Ct. 2371, 2374–75, 85 L.Ed.2d 714 (1985) (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211, 6 L.Ed. 23 (1824) (Marshall, C.J.)).

The question we must address in this case is whether Congress has enacted legislation that preempts any portions of the ordinance. *Granite Rock*, 480 U.S. at 581, 107 S.Ct. at 1425. In *Granite Rock*, the Supreme Court delineated the elements of preemption:

"[S]tate law can be pre-empted in either of two general ways. If Congress evidences an intent to occupy a given field, any state law falling within that field is pre-empted. If Congress has not entirely displaced state regulation over the matter in question, state law is still pre-empted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress."

*Id.* (citations omitted) (quoting *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984)).

Congress has enacted numerous laws (federal land laws) that provide for the management and preservation of federal land and the resources on federal land. *See, e.g.,* the Multiple–Use Sustained–Yield Act of 1960, 16 U.S.C. §§ 528–531 (1985); the Wilderness Act, 16 U.S.C. §§ 1131–1136 (1985 & Supp. 1995); the Wild and Scenic Rivers Act, 16 U.S.C. §§ 1271–1287 (1985 & Supp.1995); the Forest and Rangeland Renewable Resources Planning Act of 1974, 16 U.S.C. §§ 1600–1687 (1985 and Supp.1995); and the Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1701–1783 (1986 & Supp. 1995). Several portions of the ordinance that place requirements on federal agencies conflict with federal land laws.

■ The ordinance requires that "[f]ederal land agencies shall not acquire any private lands or rights in private lands within Boundary County without first ensuring ... parity in land ownership status is maintained; and ... private property interests are protected and enhanced." This imposes restrictions on federal agencies that are inconsistent with federal laws authorizing acquisition of land. *See, e.g.,* 16 U.S.C. § 1277 (authorizing the Secretary of the Interior and the Secretary of Agriculture to acquire land within the boundaries of any component of the wild and scenic rivers system); 43 U.S.C. § 1715(a) (authorizing the Secretary of the Interior to "acquire pursuant to [the Federal Land Policy and Management Act of 1976], by purchase, exchange, donation or eminent domain, lands or interests therein"); 7 U.S.C. § 428a (1980) (authorizing the Department of Agriculture to "acquire land, or interest therein, by purchase, exchange or otherwise, as may be necessary to carry out its authorized work"). The provisions of the ordinance limiting the acquisition of land by federal agencies stand as obstacles to the full accomplishment of the purpose Congress evidenced in these laws.

■ The ordinance requires that "Boundary County shall determine land withdrawals for hazardous and non-hazardous waste storage as well as the types and points of origin of such waste." This conflicts with the authority of federal agencies and Congress itself concerning the withdrawal of federal land. *See, e.g.,* 43 U.S.C. § 1714(a), (d) (authorizing the Secretary of the Interior to make, modify, extend or revoke withdrawals of less than five thousand acres); 43 U.S.C. § 1714(c) (requiring congressional review process for withdrawals of greater than five thousand acres).

■ The ordinance requires that "Boundary County concurrence shall be required prior to any [federal] land adjustments," "whether it be by proposed disposal, exchange or proposed change in use," and that "[b]efore federal ... land agencies can change land use, adverse impact studies on uses shall be conducted and mitigation measure adopted with concurrence from Boundary County." The ordinance states that "[t]his shall specifically include, but is not limited to any proposed changes in wildlife habitat, wildlife recovery plans, timber sales volume projections, restricted access, road closures, and primitive or wilderness designation." None of the federal land laws give local governmental units this type of veto power over decisions by federal agencies charged with managing federal land. In addition, this veto power is contrary to the provisions of the Endangered Species Act of 1973, 16 U.S.C. §§ 1531–1543 (1985 & Supp. 1995), which authorizes the Secretary of the Interior, the Secretary of Commerce, and the Secretary of Agriculture to acquire land to carry out the purposes of the Act. 16 U.S.C. § 1534. It is also contrary to the portion of the Endangered Species Act which requires the Secretary of the Interior and the Secretary of Commerce to develop and implement recovery plans for endangered species. 16 U.S.C. § 1533(f). This veto power stands as an obstacle to the accomplishment of the full purposes and objectives Congress evidenced in these federal laws. The ordinance requires that "[a]ny federally proposed designation of Wild and Scenic Rivers ... shall comply with any County water use plan." The ordinance also requires "full federal compliance in the acceptance and enforcement of" wild and scenic rivers designations by the county. These provisions are con-

# 378

trary to the process for the designation of wild and scenic rivers in the Wild and Scenic Rivers Act. 16 U.S.C. §§ 1275–1276. The requirement stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.

 The ordinance commands that "[n]o wilderness areas shall be designated in Boundary County." This conflicts with the process for the establishment of wilderness areas contained in the Wilderness Act. 16 U.S.C. § 1132.

The foregoing portions of the ordinance are preempted by federal law and are therefore unconstitutional.

## V.

## THE PORTIONS OF THE ORDINANCE THAT ARE PREEMPTED BY FEDERAL LAW ARE NOT SEVERABLE.

 The county and the board members assert that any portions of the ordinance that are unconstitutional because they are preempted by federal law are severable. We disagree.

 If an unconstitutional portion of a statute or ordinance is integral or indispensable, it is not severable, and the entire measure must fall, although the Court will, when possible, recognize and give effect to a severability clause. *Idaho Dep't of Water Resources v. United States,* 128 Idaho 246, 912 P.2d 614 (1995).

The ordinance does contain a severability clause:

If any section, subsection, sentence, clause, phrase, or portion of this ordinance is for any reason held invalid or unconstitutional by a federal or state court, such portion shall be deemed a separate, distinct and independent provision, and such holding shall not affect the validity of the remaining portions hereof.

Despite the obvious intent of the board to preserve the remainder of the ordinance if portions are declared unconstitutional, the portions of the ordinance that are preempted by federal law are so integral and indispensable to the ordinance, we conclude the entire

ordinance must fall. Some of the edicts contained in the ordinance apply to both federal and state agencies, but many are directed only at federal agencies. It is clear to us that the board did not intend to attempt to regulate only state land, but instead intended to regulate the use of all public land in the county. To sever the portions that attempt to restrict federal agencies and leave those that attempt to restrict state agencies emasculates the obvious purpose of the ordinance. Therefore, we conclude that the entire ordinance is invalid. Because of this ruling, it is unnecessary for us to address the claim that the ordinance violates the provisions of the Idaho Constitution concerning the management of state lands by the state board of land commissioners. Idaho Const. art. IX, §§ 7, 8.

## VI.

## THERE IS NO SUBSTANTIAL AND COMPETENT EVIDENCE TO SUPPORT A FINDING OF NECESSITY FOR THIS ACTION, ONE OF THE PREREQUISITES FOR THE AWARD OF ATTORNEY FEES PURSUANT TO THE PRIVATE ATTORNEY GENERAL DOCTRINE.

 The county and the board members assert that the trial court should not have awarded attorney fees pursuant to the private attorney general doctrine. We agree.

 We will overturn an award of attorney fees under the private attorney general doctrine only if the trial court has abused its discretion. *Miller v. Echo Hawk,* 126 Idaho 47, 49, 878 P.2d 746, 748 (1994). Whether the three-part test for determining to award attorney fees pursuant to the private attorney general doctrine is met requires a factual determination by the trial court. *Id.* We review factual findings that are the basis for an exercise of discretion in awarding fees to determine if the findings are clearly erroneous, that is, whether there is substantial and competent evidence to sustain them. *Id.*

One part of the test to determine whether to award attorney fees under the private attorney general doctrine is the necessity for

private enforcement. *Id.* The trial court resolved this part of the test by an oral ruling that "[n]umerous agencies who are very much aware of this ordinance and for their own purposes . . . chose not to seek . . . public enforcement of it perhaps because they would wait for a more direct threat than was presented on the facts." To the extent this constitutes a finding of fact that there was the necessity for private enforcement, we review the record to see if there is any substantial and competent evidence to support this finding.

The complaint alleges that neither the prosecuting attorney nor the attorney general would bring this action on behalf of the public. Also, there is some indication in the record that federal and state agencies were aware of the ordinance. The only other information in the record before us concerning the necessity for private enforcement is contained in comments of counsel for the parties during the hearing on the county's objections to the organizations' and the individuals' cost bill, which included attorney fees. Counsel for the organizations and individuals made the following comments:

> "The necessity for private enforcement." I don't think there's any question about that. As I point out, the Federal Government wasn't about to sue anybody. The state had sent back a letter with its—with its Benewah County opinion saying Boundary County, you can't regulate our—you can't regulate our state laws or state lands. This was ignored but the State wasn't about to do something until its finger got caught in the vice until somebody tried to do something which they had not done at the time we filed the lawsuit.

In response, counsel for the county made the following comments:

> What necessitated, what truly necessitated private enforcement. As [counsel for the organizations and the individuals] indicated, and if we take the position of [counsel for the organizations and the individuals] and just take it as the gospel, all the agencies that this policy applied to said we aren't going to worry about it, we'll take care of it when and if the question arises.

After making these comments, counsel for the county went on to argue that there was no necessity for the organizations and the individuals to bring the action. These comments of counsel are not evidence, nor do they constitute a stipulation that neither the federal nor state agencies had taken any action to challenge the ordinance. There is no evidence to support the trial court's finding that these agencies chose not to seek to have the ordinance declared invalid. Therefore, there is no basis for the award of attorney fees pursuant to the private attorney general doctrine.

## VII.

## CONCLUSION

We affirm the trial court's grant of summary judgment declaring the ordinance in violation of the U.S. Constitution and therefore null, void, and unenforceable in its entirety. We find it unnecessary to address the state constitutional implications of the ordinance. We reverse the trial court's award of attorney fees.

We award Daniel Krmpotich costs, but not attorney fees, on appeal.

McDEVITT, C.J., and TROUT, J., concur.

SILAK, Justice, concurring and dissenting.

I concur in the Court's opinion, but I respectfully dissent from Part VI.

When considering a party's entitlement to attorney fees under the private attorney general doctrine this Court considers: (1) the strength or societal importance of the policy vindicated by the litigation; (2) the necessity for private enforcement and the magnitude of the resultant burden on the plaintiff; and (3) the number of people standing to benefit from the decision. *Miller v. Echo Hawk,* 126 Idaho 47, 49, 878 P.2d 746, 748 (1994); *Hellar v. Cenarrusa,* 106 Idaho 571, 577–78, 682 P.2d 524, 530–31 (1984).

The Court's opinion concludes that respondent has not satisfied the first half of the second element, the necessity for private enforcement. Specifically, the Court states ". . . there is no evidence to support the trial court's finding that these agencies chose not

to seek to have the ordinance declared invalid." The record in this case establishes that neither the state nor the federal government joined in this suit. The federal government did not file this action and did not enter it even as an intervenor, although its amicus brief to this Court stated that the United States had a "strong interest" in seeing the ordinance declared invalid. *Compare Miller*, 126 Idaho at 48, 878 P.2d at 747 (Attorney General filed complaint in intervention asking for judicially imposed reapportionment plan). The record also shows that the Idaho Attorney General issued an opinion concluding that the State Land Board was not bound by the county ordinance, but the state of Idaho did not participate in this suit to invalidate the ordinance.

The record in this case contains the representation of counsel for respondents that the present suit was the only one of its type pending at the time the case was argued to the district court, although counsel acknowledged that a New Mexico case had been filed since then. The attorney for Boundary County did not dispute this assertion. I would accept these statements of counsel as a stipulation, particularly since the County itself, in its appellate briefing, did not raise the issue that the district court was erroneous in concluding that "[n]umerous agencies who are very much aware of this ordinance and for their own purposes ... chose not to seek ... public enforcement of it...."

The facts before the district court in *Miller* were the same as before the district court here: no governmental agency had in fact brought a court action over this issue of public importance. I therefore submit that the Court here should have followed the precedent of *Miller* and found no abuse of discretion by the district court in concluding that private attorney general fees should be awarded to plaintiffs.

SCHROEDER, Justice, concurring in part, and dissenting in part.

I concur in that portion of the Court's opinion which reverses the award of attorney fees. I dissent from the Court's determination that one of the plaintiffs has standing

and the determination that this case is ripe for determination.

## I.

## CONSTRUCTION OF IDAHO'S UNIFORM DECLARATORY JUDGMENT ACT

The Declaratory Judgment Act is remedial in nature. Its purpose is to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations, and is to be liberally construed. I.C. § 10–1212; *Idaho Mut. Benefit Ass'n v. Robison*, 65 Idaho 793, 154 P.2d 156 (1944); *State ex rel. Miller v. State Bd. of Educ.*, 56 Idaho 210, 52 P.2d 141 (1935). Idaho's Declaratory Judgment Act is to be interpreted and construed so as to effectuate its general purpose to make uniform the laws of the states which enact it and to harmonize, as far as possible, with federal declaratory judgment laws and regulations. I.C. § 10–1215.

## II.

## FACTS RELEVANT TO STANDING AND RIPENESS

The Court has determined that one of the twenty-one named plaintiffs has standing to pursue this action. To evaluate this determination it is helpful to analyze the factual background and the nature of the claim made by the one person determined to have standing.

Since adoption of the ordinance in 1992 the County has taken no steps to enforce it beyond sending requests to the federal, state, and county agencies requesting them to comply. Various officials of the state and federal agencies replied that the ordinance had no effect in terms of their exclusive authority to manage public lands under their control. The ordinance states that, "Boundary County shall enforce compliance with this Interim Land Use Plan," but the ordinance does not include a specification of fines or imprisonment as authorized by Section 31–714 of the Idaho Code. The Commissioners have taken oaths that they do not intend to seek enforcement by fines or penalties. Neither the state nor federal government is a party to this

action, although they are the entities *to* which the ordinance is directed. The federal government appeared as amicus curiae but not as a party.

The societies that have challenged the ordinance have suffered no actual harm beyond discomfort that the ordinance remains on the books.

The Court has concluded that only one of the individual plaintiffs has standing. Out of the mass of speculative injuries alleged, this case hangs on Dan Krmpotich's assertion as a commercial guide that, "If Boundary County succeeds in enforcing the ordinance *to eliminate any further wilderness and open the roadless areas up to roading and logging,* I shall lose a very substantial portion of my existing available open space usable for high quality recreation related to wildlife and wild lands." (Emphasis added to the portion of the affidavit omitted from the Court's opinion.) Contained within the statement is the *non sequitur,* that elimination of *further* wilderness will cause the loss of *existing* open space. The rest of the sentence concerns opening roadless areas up to "roading and logging." Section 6 of the ordinance is the only section which deals with timber and wood products, and it contains no mandatory provisions. Section 6 outlines policies which could be pursued with or without an ordinance. There is no provision in the ordinance that mentions roadless areas as such. Nothing in the ordinance threatens the plaintiff any more than living in a world where things may change. No road is ordered. One can only speculate what piece of land or what hypothetical road is supposedly implicated. The statement in Section 7 A.3 that there shall be no wilderness areas designated in Boundary County is clearly nothing more than a statement of policy with no indication of any means of enforcement. The plaintiff only alleges speculative financial loss. Saying that Mr. Krmpotich is an expert who can express an opinion takes the standing issue nowhere. When read in context the opinion is without foundation. The underlying concept of allowing an expert to state an opinion is that the opinion will assist the fact finder. In this case the Court has no need for an expert opinion on the effect of this ordinance.

The Court has the ordinance and can evaluate the facts. The facts get no better by surrounding them with a so-called "expert opinion." This theory of finding standing through an "expert opinion" is a creation of this Court, not asserted by any party. Out of the twenty-one named plaintiffs this case stands on an opinion without a foundation to support its weight.

The Commissioners have sworn that they do not intend to enforce the ordinance by fines or penalties. This is consistent with the County's position that the ordinance defines policy but does not order the federal and state governments to do anything contrary to their exclusive authority. Additionally, it is clear that neither the state nor federal agencies intend to comply with the ordinance if the County attempts to enforce any provisions intruding in their areas of responsibility.

## III.

### THE PLAINTIFFS LACK STANDING

The standing question bears close affinity to questions of ripeness—whether the harm asserted has matured sufficiently to warrant judicial intervention. *Warth v. Seldin,* 422 U.S. 490, 499 n. 10, 95 S.Ct. 2197, 2205 n. 10, 45 L.Ed.2d 343 (1975). "[T]here is a close relationship between ripeness and standing, especially where standing is questioned because the anticipated injury *is too remote.*" *Montague v. Meese,* 683 F.Supp. 589, 591 (N.D.Tex.1988). "The Article III doctrines of standing and ripeness are often analytically intertwined. A given anticipated injury may be characterized as nonjusticiable because it is too remote to be ripe for review on one hand, or too remote to constitute the requisite concrete harm to satisfy the injury-in-fact requirement of standing." *Allendale Leasing, Inc. v. Stone,* 614 F.Supp. 1440, 1447 n. 4 (D.R.I.1985), *aff'd,* 788 F.2d 830 (1st Cir.1986) (citing 13 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure, § 3531.12 (2d ed. 1984); *Johnson v. Stuart,* 702 F.2d 193, 196 (9th Cir.1983); *Young v. Klutznick,* 652 F.2d 617 (6th Cir.1981), *cert. denied,* 455 U.S. 939, 102 S.Ct. 1430, 71 L.Ed.2d 650 (1982); *Com-*

*monwealth Edison v. Train,* 649 F.2d 481, 483–84 (7th Cir.1980); *Pence v. Andrus,* 586 F.2d 733, 736–39 (9th Cir.1978)).

The doctrine of standing focuses on the party seeking relief and not on the issues the party wishes to have adjudicated. *Miles,* 116 Idaho at 641, 778 P.2d at 763, states:

The essence of the standing inquiry is whether the party seeking to invoke the court's jurisdiction has "alleged such a personal stake in the outcome of the controversy as to assure the concrete adversariness which sharpens the presentation upon which the court so depends for illumination of difficult constitutional questions." As refined by subsequent reformation, this requirement of "personal stake" has come to be understood to require not only a "distinct palpable injury" to the plaintiff, but also a "fairly traceable" causal connection between the claimed injury and the challenged conduct. (Citations omitted.)

Thus, to satisfy the case or controversy requirement of standing, litigants generally must allege or demonstrate an injury in fact and a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury.

*Id.* (quoting *Duke Power Co. v. Carolina Envtl. Study Group,* 438 U.S. 59, 79, 98 S.Ct. 2620, 2633–34, 57 L.Ed.2d 595 (1978)).

*Miles* focused on whether the grievance was too generalized to confer standing and reasoned that if the case were dismissed for lack of a concrete injury-in-fact, Miles would undoubtedly go before the Public Utilities Commission, lose, and appeal to the Supreme Court anyway. *Miles,* 116 Idaho at 642, 778 P.2d at 764. Although the challenged law had not as yet been applied, and no injury had as yet been suffered, the threat of injury was not conjectural.

The plaintiffs rely upon *Idaho Conservation League v. Mumma,* 956 F.2d 1508 (9th Cir.1992), for the proposition that the fact that an alleged injury is merely threatened rather than actual does not, alone, defeat a claim of standing. *Idaho Conservation League* in turn cites *Oregon Envtl. Council v. Kunzman,* 817 F.2d 484 (9th Cir.1987), and *Heckler v. Mathews,* 465 U.S. 728, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1984). However, reli-

ance upon this line of authority is misplaced, because these cases deal with instances in which there has been a procedural injury due to an agency's failure to follow a statutorily mandated procedure. That is not the situation in this case.

In *Idaho Conservation League,* the Ninth Circuit found that "the alleged procedural failure in the EIS (the actual, present harm) … 'create[s] a risk that environmental impact will be overlooked.' (in the future)." 956 F.2d at 1514 (quoting *Oregon Envtl. Council,* 817 F.2d at 491). The district court had ruled that the harmful effect of the challenged action was too remote to sustain standing because the plan at issue did not propose any specific development. The Ninth Circuit Court rejected this argument, holding that in procedural injury cases:

The standing examination … must focus on the likelihood that the defendant's action will injure the plaintiff *in the sense contemplated by Congress.*

Viewed in this light, and whether or not it is irrevocable, the Service's decision is harmful for standing purposes. The ICL's complaint is that the faulty EIS has made possible development that wilderness designation would have prevented. Pursuant to NEPA and the NFMA, these are injuries that we must deem *immediate,* not speculative. Indeed, short of assuming that Congress imposed useless procedural safeguards, and that wilderness designation is a superfluous step, we must conclude that the management plan plays some, if not a critical, part in subsequent decisions.

More importantly perhaps, if the agency action only could be challenged at the site-specific development stage, the underlying programmatic authorization would forever escape review. To the extent that the plan pre-determines the future, it represents a concrete injury that plaintiffs must, at some point, have standing to challenge. The point is now, or it is never.

*Id.* at 1516 (footnotes omitted).

In *Oregon Envtl. Council,* the Ninth Circuit addressed the issues of ripeness and standing. The court found that the plaintiffs'

challenge of an EIS was ripe for review because the agency's action was clear and final. 817 F.2d at 492. Concerning standing, the Ninth Circuit cited 13 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3531.4 at 434–37 (2d ed. 1984) in support of its rule that where a procedural injury is alleged, a contingent risk of injury meets the "injury in fact" requirements of standing. *Id.* at 491–92. In turn Wright's Federal Practice and Procedure cites to cases where the plaintiffs alleged a present procedural misstep which resulted in a lost opportunity for a future benefit, or where the risk of future harm was so great that it amounted to a present injury. *See Rockford League of Women Voters v. United States Nuclear Regulatory Comm'n,* 679 F.2d 1218, 1221–22 (7th Cir.1982); *Dimarzo v. Cahill,* 575 F.2d 15, 18 (1st Cir.1978) (per Bownes, J.), *cert. denied sub nom. Hall v. Dimarzo* 439 U.S. 927, 99 S.Ct. 312, 58 L.Ed.2d 320.

Other cases relied upon by the plaintiffs also involve an allegation of a present, procedural flaw in a statutorily mandated process. *See Sierra Club v. Marita,* 46 F.3d 606 (7th Cir.1995); *Douglas County v. Babbitt,* 48 F.3d 1495 (9th Cir.1995), *cert. denied,* — U.S. ——, 116 S.Ct. 698, 133 L.Ed.2d 655 (1996).

The facts of this case are more like the facts in *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (*Defenders* ). In that case, the plaintiffs alleged a procedural default. However, the United States Supreme Court concluded that the citizen suit provision of the Endangered Species Act does not confer a procedural right in all persons to have the Executive observe the procedures required by the act. *Defenders,* 504 U.S. at 573, 112 S.Ct. at 2143. In a pair of footnotes, the *Defenders* Court stated: "The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Id.* at 572 n. 7, 112 S.Ct. at 2142 n. 7; and an individual can enforce procedural rights "so long as the procedures in question are designed to protect some threatened concrete interest of his

that is the ultimate basis of his standing." *Id.* at 573 n. 8, 112 S.Ct. at 2143 n. 8. Nevertheless, the Supreme Court concluded that *Defenders* was not such a case. Consequently, because the plaintiffs' alleged injury was based on the fact that the plaintiffs might, at some as-yet-undetermined point in the future, want to view certain endangered species in their overseas habitat, the Supreme Court concluded that the alleged injury was too remote or speculative to confer standing. "Such 'some day' intentions—without any description of concrete plans, or indeed any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Defenders,* 504 U.S. at 564, 112 S.Ct. at 2138.

Furthermore, the Supreme Court held that when:

> a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else,* much more is needed. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well. The existence of one or more of the essential elements of standing "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or predict;" and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury. Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but is ordinarily "substantially more difficult" to establish.

504 U.S. at 562, 112 S.Ct. at 2137 (citations omitted) (emphasis in original).

The claim by the plaintiffs does not involve a procedural injury. The claim is simply that the substance of the ordinance violates the U.S. and Idaho Constitutions and laws made pursuant to those constitutions. Further,

this case falls within the reasoning of *Defenders* that "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but is ordinarily 'substantially more difficult' to establish." 504 U.S. at 562, 112 S.Ct. at 2137 (quoting *Allen v. Wright*, 468 U.S. 737, 758, 104 S.Ct. 3315, 3328, 82 L.Ed.2d 556 (1984).

On numerous occasions courts have held that a plaintiff lacks standing because there is no credible threat of enforcement of the challenged law. *Platte River Whooping Crane Critical Habitat Maintenance Trust v. FERC*, 962 F.2d 27, 35 (D.C.Cir.1992); *United Transp. Union v. I.C.C.*, 891 F.2d 908 (D.C.Cir.1989), *cert. denied*, 497 U.S. 1024, 110 S.Ct. 3271, 111 L.Ed.2d 781 (1990); *Western Mining Council v. Watt*, 643 F.2d 618, 624–27 (9th Cir.1981), *cert. denied*, 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981); *Johnson v. Stuart*, 702 F.2d at 194–95; *Pence v. Andrus*, 586 F.2d at 736–39 (per Wright, J.).

This case is on all fours with *Washington Wilderness Coalition v. Walla Walla County*, CS–94–312–AAM E.D.Wash. (1995) (an unreported memorandum decision on summary judgment), *aff'd*, 74 F.3d 1247 (9th Cir.1996). In that case, the United States District Court for the Eastern District of Washington considered a challenge to an ordinance similar to the one at issue here:

> First, plaintiffs do not gain standing by asserting that the ordinances restrain government employee actions, which restraint threatens harm to public lands and natural resources. The harmful government employee action is merely hypothetical; the only named government employees attest that they have not changed their actions in response to the ordinances. Presumably, plaintiffs argue that other government employees without Berlier and Tu's principles would follow the ordinances. Argument is not enough. Without proving that a government employee has (or threatens to) delay environmental assessment or similar conservation action because of the ordinances, plaintiffs have not shown that the environment will suffer. Plaintiffs therefore fail to prove the first element of standing, actual harm, for this theory.

Slip op. at p. 18 (footnote omitted). The court also held that the plaintiffs did not have standing based on one plaintiff's claim that the ordinance "chilled" his wilderness advocacy efforts. The court based this conclusion on the fact that: (1) the plaintiff failed to allege any specific restraint on his advocacy activities, and (2) because more than one year had passed without any attempt to enforce the ordinance and the ordinance was not directed at the actions of private individuals. The plaintiff had failed to demonstrate that his fear of enforcement was reasonable. *Id.* at p. 21–22

## IV.

### RIPENESS AND DECLARATORY JUDGMENTS

In *Miles v. Idaho Power*, 116 Idaho 635, 778 P.2d 757 (1989), this Court departed from a long line of Idaho case law which held that until a challenged law is applied, the issue of the law's validity is not ripe for review. *See State ex rel. Andrus v. Click*, 97 Idaho 791, 797 n. 3, 554 P.2d 969, 975 n. 3 (1976) (where there's no application for a permit, nor determination that a mining operation is not in the public interest, the Supreme Court would not determine whether challenged provision empowering Board to so decide was unconstitutional); *State v. Standlee*, 96 Idaho 165, 168, 525 P.2d 360, 363 (1974) (where there's been no application for parole and thus no denial, challenge to statute providing no release of violent offenders until a third of their sentence is served is premature); *State v. Clark*, 88 Idaho 365, 377, 399 P.2d 955, 962 (1965) (person can only challenge constitutionality of statute when and only insofar as it is being or about to be applied to his disadvantage); *Schmidt v. Village of Kimberly*, 74 Idaho 48, 62–63, 256 P.2d 515, 524 (1953) (question of constitutionality of ordinance can only arise out of attempt to enforce the regulation; therefore, the issue is premature where the challenged ordinance does not provide any method or procedures to compel compliance); *Idaho Mut. Benefit Ass'n v. Robison*, 65 Idaho at 803, 154 P.2d at 161 (where no penalties are yet imposed, question of whether penalties authorized by statute are unconstitutional is

not properly before the Supreme Court); *Twin Falls Canal Co. v. Huff*, 58 Idaho 587, 592, 76 P.2d 923, 925 (1938) (one not injured or in immediate danger of injury through enforcement cannot question constitutionality of statute). *See also United Mercury Mines Co. v. Pfost*, 57 Idaho 293, 296, 65 P.2d 152, 153 (1937) (injunction to restrain enforcement of law improper where defendants denied they intended to enforce law until issue of enforcement funding resolved).

*Miles* held that a ratepayer's constitutional challenge of a state law implementing a water rights subordination agreement between Idaho Power and the State was ripe for review, although the challenged statute had not yet been applied. 116 Idaho 635, 778 P.2d 757. In reaching this conclusion the Court reasoned that there was no reason to believe the Idaho Public Utilities Commission (IPUC) would not implement the statute. If the action were dismissed for lack of ripeness, Miles could simply request a rate reduction before the IPUC which would then be required to deny Miles' request pursuant to the challenged statute, which denial Miles would then appeal. Thus the Court reasoned no new facts would be developed in the interim, and the legal issues would be unchanged from the appeal that was pending. Dismissal of the appeal would delay implementation of the agreement, and nothing would be gained by delaying adjudication of the issue. "Since we are persuaded that 'we will be in no better position than we are now' to decide this question, we hold that it is presently ripe for adjudication." *Miles*, 116 Idaho at 643, 778 P.2d at 765 (citing *Duke Power v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 82, 98 S.Ct. 2620, 2635, 57 L.Ed.2d 595).

In *Duke Power*, the U.S. Supreme Court held that the plaintiffs' constitutional challenge of the Price–Anderson Act was ripe for judicial review, despite the fact that no nuclear accident had yet occurred, and such an occurrence would eliminate much of the scientific uncertainty surrounding the subject. 438 U.S. 59, 98 S.Ct. 2620. The Court reasoned that the plaintiffs would suffer immediate injury to their environment if the proposed nuclear power plants were built; the occurrence of a nuclear accident would not significantly advance the Court's ability to deal with the legal issues presented; and, delayed resolution would frustrate one of the key purposes of the challenged act—elimination of doubts concerning the scope of private liability in the event of a nuclear accident. *Id.*

The phrase "we will be in no better position later than we are now," quoted in *Duke Power* (and consequently, in *Miles*), is taken from the *Blanchette v. Connecticut Gen. Ins. Corp.*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), in which the U.S. Supreme Court held that a constitutional challenge to the conveyance provisions of the Regional Rail Reorganization Act (Rail Act) was ripe for review, despite the fact that no conveyance had taken place. In *Blanchette*, 419 U.S. at 143, 95 S.Ct. at 358, the Court reiterated its earlier holdings regarding adjudication of a statute's constitutionality before it has been applied. *See Carter v. Carter Coal Co.*, 298 U.S. 238, 287, 56 S.Ct. 855, 862, 80 L.Ed. 1160 (1936) (where inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect); *Pennsylvania v. West Virginia*, 262 U.S. 553, 593, 43 S.Ct. 658, 663–64, 67 L.Ed. 1117 (1923) ("One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough."). The Court then concluded that because delay in adjudicating the issue of the Rail Acts validity would create serious risk that later consideration of the issue would be too hasty to afford protection of rights or too late to prevent irreparable harm the matter was ripe for review. *Blanchette*, 419 U.S. at 144–45, 95 S.Ct. at 359.

This Court's prior decisions and the relevant federal cases establish that the validity of a law which has not yet been applied or enforced is ripe for adjudication provided: (1) it is inevitable that the law will be applied, or delay in consideration will create a risk of irreparable harm, and (2) further development of the facts will not clarify the legal issues.

Boundary County argues that the challenged provisions of the ordinance are merely statements of policy and expressions of the desires of the County and do not change existing law and related rights, though the language often appears mandatory. The Commissioners have not sought to enforce the ordinance since its passage in 1992 and do not intend to seek enforcement of the ordinance by fines or penalties. As a consequence, Boundary County maintains that harm has neither occurred nor will occur to the plaintiffs or their rights.

The plaintiffs maintain that further factual development will not advance legal analysis and resolution of the constitutional issues raised, and that passage of the ordinance has led to confusion and uncertainty as to their legal rights and relations. If the suit is dismissed for lack of ripeness, the plaintiffs argue that the issue is bound to arise at some point in the future because at least seven Idaho counties have passed similar ordinances and numerous others are considering such action.

The district court reasoned that the suit involves actual and existing facts which threaten and endanger the rights of one or more of the plaintiffs, and that a declaratory judgment on the ordinance's validity would clarify and settle the legal relations in issue.

As this Court noted in *State v. Rhoades*, 119 Idaho 594, 809 P.2d 455 (1991):

Declaratory judgments by their very nature ride a fine line between purely hypothetical or academic questions and actually justiciable cases. Many courts have noted that the test of justiciability is not susceptible of any mechanistic formulation, but must be grappled with according to the specific facts of each case.

*Id.* at 598, 809 P.2d at 459.

## V.

## THE PRESENT CONTROVERSY IS NOT RIPE FOR DETERMINATION

This case is similar to the facts in *United Mercury Mines Co. v. Pfost*, where the defendants, who would be charged with enforcing the challenged law, stated that they had no intention of enforcing the law unless and until enforcement funding was appropriated. 57 Idaho at 296, 65 P.2d at 153. The Court in *United Mercury Mines* stated, "under no consideration should a legislative act be declared unconstitutional upon such a state of facts." *Id.* See also *Twin Falls Canal Co.*, 58 Idaho at 592, 76 P.2d at 925 (one not injured or in immediate danger of injury through enforcement cannot question constitutionality of statute).

The averments of threatened harm in this case are comparable to those rejected by the U.S. Supreme Court in *Defenders*, 504 U.S. 555, 112 S.Ct. 2130. "Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." 504 U.S. at 564, 112 S.Ct. at 2138.

*Miles*, 116 Idaho 635, 778 P.2d 757, read together with the preceding authority, requires as an element of a declaratory judgment that there be no doubt that the law will be enforced or that delay in consideration will create a risk of irreparable harm. In this case the record is to the contrary. Years have passed, and there has been no effort to enforce the ordinance. The Commissioners swear it will not be enforced by fines or penalties. The record does not show that delay in consideration will create a risk of irreparable harm. The case is not ripe for adjudication in a declaratory judgment action for these reasons. Additionally, in light of the Commissioners' position that the ordinance is a statement of policy rather than an attempt to compel the state and federal governments to do things they are not otherwise required to do by their own laws, it is clear that only a real controversy between the County and an actual aggrieved party would focus and clarify the legal issues. Thus, the case is not ripe for judicial determination.

## VI.

## CONCLUSION

The controversy in this case is not ripe for adjudication. None of the plaintiffs has standing. There has been no shown need for

this lawsuit which has cost the plaintiffs, the county, amicus and this Court considerable time and/or expense. The path to speculative lawsuits may have been opened.