2007 OK 73

STATE of Oklahoma ex rel. Charles W. WRIGHT and Rachel Lawrence Mor, individuals and Taxpayer Citizens of the State of Oklahoma, Plaintiffs/Appellants,

v.

OKLAHOMA CORPORATION COMMISSION, a state agency, and Commissioners Denise A. Bode, Jeff Cloud, Bob Anthony, and Brooks Mitchell, Director of the Oklahoma Storage Tank Division, and Ben Jackson, General Counsel Oklahoma Corporation Commission, and ConocoPhillips Company, an Oklahoma corporation, Defendants/Appellees.

State of Oklahoma ex rel. Oklahoma Corporation Commission, State of Oklahoma ex rel. Brooks Mitchell, Director of the Oklahoma Storage Tank Division; and, State of Oklahoma ex rel. Robyn Strickland, Administrator of the Oklahoma Petroleum Storage Tank Release Environmental Cleanup Indemnity Fund, Plaintiffs/Appellees,

v.

ConocoPhillips Company, Defendant/Appellee,

v.

Rachel Lawrence Mor and Charles W. Wright, Intervenors/Appellants.

Nos. 101,605, 101,606.

Supreme Court of Oklahoma.

Oct. 2, 2007.

As Corrected Oct. 3, 2007.

David Pomeroy, Terry Stokes, Fuller, Tubb, Pomeroy & Stokes, P.C., Oklahoma City, OK, for Plaintiffs/Appellants in No. 101,605, and for Intervenors/Appellants in No. 101,606.

Kieran D. Maye, Jr., Miller Dollarhide, Oklahoma City, OK, for Defendant/Appellees Oklahoma Corporation Commission, Commissioner Denise A. Bode, Commissioner Jeff Cloud, Commissioner Bob Anthony, Brooks Mitchell, and Ben Jackson in No. 101,605, and for Plaintiffs/Appellees in 101,606.

Rob F. Robertson, Dennis C. Cameron, Gable & Gotwals, Oklahoma City, OK, for Appellee ConocoPhillips Company in 101,605 and Defendant/Appellee in 101,606.

EDMONDSON, V.C.J.

¶ 1 This case involves procedural issues in a *qui tam* proceeding and a related declaratory judgment proceeding. The first order brought for appeal is a district court order granting a motion, without prejudice, that sought dismissal of a taxpayer *qui tam* remedy sought against the Oklahoma Corporation Commission and other defendants.[1] The second order brought before us on appeal is a district court order denying those same taxpayers' motion to intervene in a related declaratory judgment proceeding brought by the Oklahoma Corporation Commission that sought judicial approval of a settlement agreement made by the Corporation Commission and others.[2] We address both appeals with a single opinion.[3]

¶ 2 The Oklahoma Legislature created the Petroleum Storage Tank Release Indemnity Program in 1989. Oklahoma Statutes Title 17 §§ 350–358, inclusive.[4] The Indemnity Program created the Petroleum Storage Tank Release Environmental Cleanup Indemnity Fund (Indemnity Fund) to pay statutorily specified expenses related to rehabilitating sites polluted by petroleum from petroleum storage tank systems. 17 O.S. §§ 352(5), 353.

¶ 3 Phillips Petroleum Company, now ConocoPhillips Company (and herein Phillips), between 1991 and 1998 filed claims for reimbursement from the Indemnity Fund and was paid approximately 2.9 million dollars. In 2000 Phillips filed twenty-seven claims for additional payments from the Indemnity Fund. Employees of the Corporation Commission determined that Phillips was entitled

1. The district court order is appealable because a dismissal without prejudice that prevents judgment is treated as a final order for the purpose of an appeal. *Gilliland v. Chronic Pain Associates,* 1995 OK 94, ¶ 7, 904 P.2d 73, 76.

2. A district court order that denies a motion to intervene is appealable as a final order. *Matter of B.C.,* 1988 OK 4, ¶ 13, 749 P.2d 542, 544; 12 O.S.2001 Ch. 15, App. 1, Okla.Sup.Ct.R. 1.20(b)(5).

3. The facts for the controversy related herein are taken from *allegations* made by Taxpayers, Phillips, the Corporation Commission, and its employees from their motions and pleadings in the trial court in two proceedings, taxpayers' *qui tam* proceeding, and the Corporation Commission's declaratory judgment action. Those documents serve as the appellate record. 12 O.S.2001 Ch. 15, App. 1, Okla.Sup.Ct.R. 1.36.

4. 1989 Okla. Sess. Laws Ch. 90, §§ 18–27; 2001 O.S.2001 §§ 350–358.

to an additional $940,000, approximately, and this amount was paid.

¶ 4 The total amount requested by Phillips was in excess of 5.9 million dollars, but it received only $3,941,170.00. Phillips pressed the Commission for additional payment on its claims. The State Auditor and Inspector reviewed the amounts paid to Phillips and determined that of the $3,941,170.00 paid to Phillips only $2,924,346.00 was within the pertinent statutory authority, and that $1,026,824.00 was questioned as an unauthorized overpayment.

¶ 5 Phillips pressed for additional payment on its claims. In August of 2003 Brooks Mitchell, Director of the Storage Tanks Division, and Ben Jackson, General Counsel for the Oklahoma Corporation Commission, agreed to pay Phillips an additional 3.6 million dollars from the Indemnity Fund. In August of 2003 the agreement was executed authorizing payment of an additional 3.6 million dollars in monthly installments, and Phillips agreed to refrain from pressing for additional payments.

¶ 6 Taxpayers *allege* that prior to the 3.6 million-dollar payment, new Commission employees became involved with the "leadership" of the Indemnity Fund and the Petroleum Storage Tanks Division. They allege in their Petition that the Commissioners, Commission management, including Brooks Mitchell, Director of the Storage Tanks Division, and Ben Jackson, General Counsel for the Corporation Commission, "were repeatedly informed by their legal counsel of the findings of the State Auditor that ... Phillips' claims had been more than fully paid and no further payment was authorized by statute or other authority."

¶ 7 Taxpayers allege that the impropriety of the settlement agreement includes (1) payment on a case in which the Commission entered an order denying Phillips' claim, that order having been affirmed on appeal to the Oklahoma Supreme Court and mandate previously issued, (2) payment for cases where not statutorily authorized, (3) payment on claims where there was no qualifying documented release of petroleum into the environment, (4) payment for attorney fees and litigations costs when the cases were not litigated, and (5) payment for landscaping and other nonenvironmental cleanup costs.

¶ 8 In July, 2004, Taxpayers sent to the Corporation Commission and the individual Commissioners a Tax Payer Demand—Qui Tam Notice demanding that the Commission rescind the agreement and reclaim funds paid to Phillips in violation of Oklahoma law. The demand letter states that the State Auditor and Inspector questioned $1,026,824.00 as an unauthorized payment to Phillips and that the Commission had improperly agreed to pay an additional 3.6 million dollars to Phillips.

¶ 9 In support of their view that funds had been improperly paid to Phillips, Taxpayers' demand letter alleges that the 3.6 million included payment for a claim that the Commission had previously denied, which order "had been affirmed on appeal to the Oklahoma Supreme Court." They also allege that the settlement agreement provided for payment "on cases for which reimbursement is statutorily not permitted, such as attorney fees, litigation costs, landscaping and other non-environmental clean-up costs." The demand letter also alleges that the settlement agreement improperly paid Phillips for sites and claims not eligible for reimbursement from the Indemnity Fund. The demand letter states that Officers of the Commission "entered into the settlement agreement permitting the transfer of state environmental funds for claims which were '. . . known to be fraudulent or void, or in pursuance of any unauthorized, unlawful or fraudulent contract or agreement.'"

¶ 10 In August of 2004, the Corporation Commission filed a Petition for Declaratory Judgment in the District Court of Oklahoma County. The petition alleged that Phillips filed claims in excess of $7,000,000.00 against the Indemnity Fund for reimbursement of expenses involved relating to forty-six retail fuel outlets. The claims had been previously disallowed by the Indemnity Fund. The petition states that the parties reached a settlement agreement by which the Indemnity Fund would pay Phillips 3.6 million dollars in monthly installments and Phillips would dismiss its pending claims. The Indemnity

Fund and Phillips also agreed to a mutual dismissal of an appeal pending before the Oklahoma Supreme Court.

¶ 11 The petition states that after extensive evaluation of Phillips' claims, with the assistance of a mediator, the Indemnity Fund and Phillips "reached a settlement agreeing upon a fair and reasonable value of the services in question and resolving all disputes for all claims that were the subject of the mediation." The petition states that the settlement resolved claims "which could have exceeded $9,000,000.00 inclusive of interest, costs and attorney's fees."

¶ 12 The petition states that the Commission and its Commissioners had received a letter demanding that the agreement be rescinded and that the Commission "reclaim all environmental funds which had been paid to Phillips as a result of the Settlement Agreement which the demanders contend was made in violation of Oklahoma law." It also states that the claims asserted in the written demand "have raised certain questions which need resolution." The petition does not state what those "certain questions" are or otherwise identify the specific nature of the claims made by the taxpayers. The Settlement Agreement is attached as an exhibit to the petition but the demand letter is not. Phillips answered and claimed that the settlement agreement should be enforced. Taxpayers sought to intervene in the declaratory judgment action brought by the Corporation Commission. Taxpayers alleged that the settlement was "illegal," "fraudulent," and a "sham" because the Commission and Phillips had earlier agreed to "settle" the claims for 3.6 million, and that the Settlement Agreement was the result of "clandestine meetings, mistreatment of Commission employees, and manipulating a sham mediation leading" to the Settlement Agreement.[5] Both Phillips and the Corporation Commission objected to the intervention.

¶ 13 Shortly after the Commission filed its declaratory judgment action the Taxpayers sought a *qui tam* remedy in a different District Court proceeding. They sought relief against the Oklahoma Corporation Commission, the three Commissioners, the Director of the Storage Tank Division, the General Counsel for the Corporation Commission, and Phillips. The Corporation Commission defendants and Phillips sought dismissal of the *qui tam* request. The District Court granted their motions to dismiss and denied the Taxpayers' motion to intervene in the Corporation Commission's declaratory judgment action.

¶ 14 The taxpayers appealed both orders, and both were reversed by the Court of Civil Appeals by unpublished opinions. Although our conclusions lead us to the same result reached by appellate court, we granted certiorari to address the first-impression questions raised by the parties that involve the public nature of the Petroleum Storage Tank Release Environmental Cleanup Indemnity Fund.[6]

¶ 15 Phillips sought dismissal of the *qui tam* proceeding based upon 12 O.S.2012(B)(6) and (8). In support of its § 2012(B)(6) dismissal request, Phillips argued that the *qui tam* action was premature because the Corporation Commission had filed a declaratory judgment action against Phillips and that *qui tam* was improper because the funds at issue did not belong to the State of Oklahoma. In support of its § 2012(B)(8) request, Phillips argued that the declaratory judgment action was pending and would determine the validity of Corporation Commission's conduct that was challenged by the *qui tam* action. The Corporation Commission sought dismissal of the *qui tam* request and argued that (1) the Petition failed to state a claim upon which relief can be granted, (2) the Plaintiffs lacked

**5.** Some of the taxpayer/intervenors/*qui tam* plaintiffs profess to have knowledge of the alleged sham mediation and improper payment of claims from their former employment. Taxpayers include in their number a former Corporation Commissioner, a former Director of the Corporation Commission's Petroleum Storage Tank Division, a former General Counsel for the Corporation Commission, a former Deputy General Counsel for the Corporation Commission, and a former Corporation Commission attorney assigned to represent the Petroleum Storage Tank Division with the claims filed by Phillips.

**6.** One reason the Court may grant certiorari is when the Court of Civil Appeals has decided an issue not previously determined by this Court. 12 O.S.2001 Ch. 15, App. 1, Okla.Sup.Ct.R. 1.178(a)(1).

standing, (3) another action was pending,"between the true and proper parties in interest to the issues underlying this action," and (4) the Corporation Commission defendants were "not parties to the settlement agreement attacked by plaintiffs' Petition and have no authority over said agreement."

¶ 16 On certiorari Phillips argues that (1) the Indemnity Fund does not contain state funds or funds belonging to the state, (2) dismissal of the *qui tam* action is required because of this Court's holdings in *City of Oklahoma City v. Oklahoma City Urban Renewal Authority*, 1999 OK 71, 988 P.2d 901 (*Tal I*) and *State ex rel. Tal v. Norick*, 1999 OK 85, 991 P.2d 999 (*Tal II*), and (3) the appellate court incorrectly applied a standard of review appropriate for a summary judgment motion instead of one for a motion to dismiss. Similar arguments are made by the Corporation Commission in its petition for certiorari. We address both petitions for certiorari in the order presented by Phillips.

¶ 17 A *qui tam* request is one brought under a statute that establishes a penalty for the commission or omission of a certain act and provides that the penalty shall be recoverable in a civil action, with part of it going to the one bringing the action and the rest to the state or a public body. *State ex rel. Trimble v. City of Moore*, 1991 OK 97, n. 1, 818 P.2d 889, 891 and 894. Resident taxpayers of a state governmental unit may, in the name of the State of Oklahoma as plaintiff, seek *qui tam* relief under 62 O.S.2001 §§ 372 and 373 [7] to recover money or property belonging to that governmental unit that was paid out or transferred illegally or without authority. *Trimble*, 818 P.2d at 894. These statutes transform a private citizen and taxpayer into a representative of the state for the purpose of protect-

7. 62 O.S.2001 § 372:

Every officer of the state and of any county, township, city, town or school district, who shall hereafter order or direct the payment of any money or transfer of any property belonging to the state or to such county, city, town or school district, in settlement of any claim known to such officers to be fraudulent or void, or in pursuance of any unauthorized, unlawful or fraudulent contract or agreement made or attempted to be made, for the state or any such county, city, town or school district, by any officer thereof, and every person, having notice of the facts, with whom such unauthorized, unlawful or fraudulent contract shall have been made, or to whom, or for whose benefit such money shall be paid or such transfer of property shall be made, shall be jointly and severally liable in damage to all innocent persons in any manner injured thereby, and shall be furthermore jointly and severally liable to the state, county, city, town or school district affected, for triple the amount of all such sums of money so paid, and triple the value of property so transferred, as a penalty, to be recovered at the suit of the proper officers of the state or such county, city, town or school district, or of any resident taxpayer thereof, as hereinafter provided.

62 O.S.2001 § 373:

Upon the refusal, failure, or neglect of the proper officers of the state or of any county, township, city, town, or school district, after written demand signed, verified and served upon them by ten resident taxpayers of the state or such county, township, city, town, or school district, to institute or diligently prosecute proper proceedings at law or in equity for the recovery of any money or property belonging to the state, or such county, township, city, town, or school

district, paid out or transferred by any officer thereof in pursuance of any unauthorized, unlawful, fraudulent, or void contract made, or attempted to be made, by any of its officers for the state or any such county, township, city, town, or school district, or for the penalty provided in the preceding section, any resident taxpayer of the state or such county, township, city, town, or school district affected by such payment or transfer after serving the notice aforesaid and after giving security for cost, may in the name of the State of Oklahoma as plaintiff, institute and maintain any proper action which the proper officers of the State, county, township, city, town, or school district might institute and maintain for the recovery of such property, or for said penalty; and such municipality shall in such event be made defendant, and one-half (1/2) the amount of money and one-half (1/2) the value of the property recovered in any action maintained at the expense of a resident taxpayer under this section, shall be paid to such resident taxpayer as a reward. If all claims stated by the resident taxpayers in the written demand are determined in a court of competent jurisdiction to be frivolous, the resident taxpayers who signed such demand and who are parties to the lawsuit in which such claims are determined to be frivolous shall be jointly and severally liable for all reasonable attorney fees and court costs incurred by any public officer or officers or any other person alleged in such demand to have paid out, transferred, or received any money or property belonging to the state, or such county, township, city, town or school district in pursuance of any alleged unauthorized, unlawful, fraudulent, or void claim paid or contract or conveyance made, or attempted to be made, by such officer or officers

ing the governmental unit's property rights. *Id.* Phillips and the Commission argue that the Petroleum Storage Tank Release Environmental Cleanup Indemnity Fund contains no property belonging to the State of Oklahoma and a *qui tam* request for relief is thus improper.

**8.** 1989 Okla. Sess. Laws, Ch. 90, § 22; 17 O.S.Supp.1989 § 353.

**9.** 17 O.S.Supp.2006 § 353:

A. There is hereby created within the Corporation Commission, the "Petroleum Storage Tank Indemnity Fund". The Director shall hire an Administrator who shall administer the Indemnity Fund and Indemnity Fund Program. The Indemnity Fund shall be administered by the Administrator for the benefit of those persons determined to be eligible by the Administrator to receive total or partial reimbursement for:

1. The costs determined to be eligible by the Administrator in preparing a corrective action plan;

2. The cost of corrective action taken in response to an eligible release;

3. Payment of claims for property damage or personal injury resulting from an eligible release; and

4. Necessary costs incidental to the cost of a site assessment or the corrective action taken and for filing and obtaining reimbursement from the Indemnity Fund.

B. Reimbursements made to or for the benefit of eligible persons shall be exempt from the Oklahoma Central Purchasing Act.

C. 1. Costs incurred as a result of a release from a storage tank system owned or operated by this state or by the federal government are not reimbursable pursuant to the provisions of the Oklahoma Petroleum Storage Tank Release Indemnity Program. State and federally owned facilities shall take the proper corrective action as may be necessary to protect the environment from a leaking storage tank system. Provided, that an agency of the state may access said fund for reimbursement when it purchases property containing storage tanks from an owner or operator qualified to access the Indemnity Fund and upon which an eligible release has occurred prior to the agency acquiring the property. In such case, the agency of the state shall be reimbursed for allowable costs in excess of Five Thousand Dollars ($5,000.00) with the attendant co-pay as referenced in subsection H of Section 356 of this title available to the agency at the same level or amount of reimbursement as the qualified owner or operator would have received pursuant to Section 356 of this title.

2. Costs incurred as a result of a release from a storage tank system owned or operated by a Class I Railroad are not reimbursable pursuant to the provisions of the Oklahoma Petroleum Storage Tank Release Indemnity Program.

D. The Indemnity Fund shall consist of:

## I. Indemnity Funds Are State Funds

■ ¶ 18 The Indemnity Fund was created by the Legislature in 1989,[8] and is now codified at 17 O.S.Supp.2006 § 353.[9] Although

1. All monies received by the Commission as proceeds from the assessment imposed pursuant to Section 354 of this title;

2. Interest attributable to investment of money in the Indemnity Fund; and

3. Money received by the Commission in the form of gifts, grants, reimbursements, or from any other source intended to be used for the purposes specified by or collected pursuant to the provisions of the Oklahoma Petroleum Storage Tank Release Indemnity Program.

E. 1. The monies deposited in the Indemnity Fund shall at no time become monies of the state and shall not become part of the general budget of the Commission or any other state agency. Except as otherwise authorized by the Oklahoma Storage Tank Regulation Act and the Oklahoma Petroleum Storage Tank Release Indemnity Program, no monies from the Indemnity Fund shall be transferred for any purpose to any other state agency or any account of the Commission or be used for the purpose of contracting with any other state agency or reimbursing any other state agency for any expense.

2. No monies from the Indemnity Fund shall be used to pay or reimburse the Commission for the salary of any employee, except for the Compliance and Inspection Department, while such employee is performing work involved in the regulation of storage tanks pursuant to the Oklahoma Storage Tank Regulation Act or the administration of programs pursuant to said act, including the development, review and approval of corrective action plans as required by the regulatory programs; however, the Indemnity Fund shall pay for all costs associated with administering the Compliance and Inspection Department including, but not limited to, automobile and travel costs, computer software and equipment, and other costs incurred in administering the Compliance and Inspection Department. The Commission shall cross train the field staff of the Petroleum Storage Tank Division to perform inspections and related field activities for all programs within the Division and the Oklahoma Petroleum Storage Tank Release Indemnity Program may reimburse the Division the actual costs of inspection services performed on behalf of the Oklahoma Petroleum Storage Tank Release Indemnity Program.

3. Monies in the Indemnity Fund shall only be expended for:

a. reimbursements to eligible persons unless duly assigned to another, and

b. costs incurred by the Indemnity Fund Program for the administration of the fund and costs incurred for the sole purpose of evaluating claims and determining whether specific claims

§ 353 has been amended several times,[10] the statutory sources for the money deposited in the fund has remained constant since 1989. Section 353 identifies the sources of Indemnity Funds as follows:

D. The Indemnity Fund shall consist of:

1. All monies received by the Commission as proceeds from the assessment imposed pursuant to Section 354 of this title;

2. Interest attributable to investment of money in the Indemnity Fund; and

3. Money received by the Commission in the form of gifts, grants, reimbursements, or from any other source intended to be used for the purposes specified by or collected pursuant to the provisions of the Oklahoma Petroleum Storage Tank Release Indemnity Program.

17 O.S.Supp.2006 § 353(D).

¶ 19 The assessment imposed pursuant to § 354 is "an assessment of one cent ($0.01) per gallon upon the sale of each gallon of motor fuel, diesel fuel and blending materials used or consumed in this state." 17 O.S.Supp.2006 § 354(A). The § 354 assessment of one cent ($0.01) per gallon is precollected and remitted to the Oklahoma Tax Commission in accordance with the provisions of the Motor Fuel Tax Code (68 O.S. § 500.1, et seq.). 17 O.S.Supp.2006 § 354(A). The motor fuel tax is a direct tax on the ultimate consumer of the fuel and, like the § 354 assessment, is precollected before the sale to the ultimate consumer.[11] The assessment is precollected by "every supplier, licensed importer or any other appropriate person...." 17 O.S.2001 § 355(A). The leg-

islative intent is that the Oklahoma Petroleum Storage Tank Release Indemnity Program be funded by an assessment on the sale of motor fuel, diesel fuel, and blending materials in this state by a distributor. 17 O.S.Supp.2006 § 351(A)(7).

¶ 20 The § 354 assessment of one cent ($0.01) per gallon is currently [12] distributed this way: (1) First one million dollars in a fiscal year to the Corporation Commission Revolving Fund, (2) Eight per cent of the remaining money to the Department of Environmental Quality Revolving Fund, (3) Twenty-five per cent of the money remaining after (1) and (2) to the Higher Education Facilities Revolving Fund until the amount deposited since July 1, 2002, totals thirty-eight million dollars, and (4) Seventy-five per cent of the remaining after (1) and (2) to the Petroleum Storage Tank Indemnity Fund. 17 O.S.Supp. 2006 § 354(C)(1–4). This formula is modified upon certain events and amounts are distributed to the Corporation Commission Storage Tank Regulation Revolving Fund (17 O.S.Supp.2006 § 315), the State Transportation Fund for matching Federal–Aid funds, and additional amounts to the Petroleum Storage Tank Indemnity Fund. 17 O.S.Supp. 2006 § 354(C)(5) & (D).

¶ 21 The Oklahoma Attorney General, through an Assistant Attorney General, filed an *amicus curiae* brief with the District Court and addressed the issue of the nature of the Indemnity Fund. The brief describes the Indemnity Fund as containing public money funded by a one penny gasoline tax. In support of this conclusion that the one-

qualify for payment or reimbursement from such Indemnity Fund.

Any costs incurred by and reimbursed to the Commission pursuant to the provisions of the Oklahoma Petroleum Storage Tank Release Indemnity Program shall not exceed the actual expenditures made by the Commission to implement the provisions of the Oklahoma Petroleum Storage Tank Release Indemnity Program.

4. Payment of claims from the Indemnity Fund shall not become or be construed to be an obligation of this state. No claims submitted for reimbursement from the Indemnity Fund shall be paid with state monies.

**10.** Section 353 was amended in 1989, 1990, 1991, 1993, 1995, 1996, 1997, 1998, 1999, 2002, 2005, 2006, and 2007. For the most recent

version of § 353 see 2007 Okla. Sess. Law Serv. Ch. 109, § 2.

**11.** 68 O.S.2001 § 500.4(D) (the motor fuel tax levy is "a direct tax on the retail or ultimate consumer precollected for the purpose of convenience and facility to the consumer," and "levy and assessment on other persons ... shall be as agents of the state for the precollection of the tax.").

**12.** From July 1, 2002 until July 1, 2004, and after the first one million dollars were collected and deposited into the Corporation Commission Revolving Fund, fifty percent of the one-cent assessment was paid to the Higher Education Facilities Revolving Fund. 17 O.S.Supp.2002 § 354(C)(2).

cent assessment creates a public fund, the brief points out the creation of the Higher Education Facilities Revolving Fund and its use to pay for construction of a weather center at the University of Oklahoma and for facilities on the campus at Oklahoma State University. In 2002 the Legislature created "in the State Treasury a revolving fund for the Department of Central Services to be designated the 'Higher Education Facilities Revolving Fund'" and the one-cent assessment paid to this Fund is for purposes described by the *amicus curiae* brief. 74 O.S.Supp.2006 § 110.4; 2002 Okla. Sess. Laws Ch. 23, §§ 1–2.

¶ 22 Neither Phillips nor the Corporation Commission challenges the one-cent assessment as creating state funds that are distributed to the Corporation Commission Revolving Fund, the Department of Environmental Quality Revolving Fund, and the Higher Education Facilities Revolving Fund. They do not expressly argue that the public nature of these funds somehow loses its character as state funds when distributed to the Indemnity Fund. Instead, they rely upon a statute, 17 O.S.Supp.2006 § 353(E)(1), and a comparison of the Indemnity Fund with the State Insurance Fund, now CompSource Oklahoma.[13]

¶ 23 Section 353(E)(1) states the following.

E. 1. The monies deposited in the Indemnity Fund shall at no time become monies of the state and shall not become part of the general budget of the Commission or any other state agency. Except as otherwise authorized by the Oklahoma Storage Tank Regulation Act and the Oklahoma Petroleum Storage Tank Release Indemnity Program, no monies from the Indemnity Fund shall be transferred for any purpose to any other state agency or any account of the Commission or be used for the purpose of contracting with any other state agency or reimbursing any other state agency for any expense.

Phillips and the Commission emphasize the language: "The monies deposited in the Indemnity Fund shall at no time become monies of the state...." Of course, this language shows legislative intent, but a mere legislative declaration that particular funds are not monies of the state is not, by itself, determinative of the issue.[14]

¶ 24 One of the circumstances we examine is the identity of the owner of the funds at issue. *State ex rel. Twist v. Bailey*, 1956 OK 103, ¶ 4, 295 P.2d 763, 765. While the Commission and Phillips deny ownership interest in these funds by the State of Oklahoma, they do not state what *entity* owns such funds. They argue that the funds are distributed to the Petroleum Storage Tank Release Environmental Cleanup Indemnity Fund. But nothing in the Petroleum Storage Tank Release Indemnity Program indicates that the Indemnity Fund is anything other than a specified account for holding money to be distributed according to the indemnity program. The Indemnity Fund cannot *own* the funds distributed to the Indemnity Fund unless it is an *entity* as well as an account. The Indemnity Fund is maintained, operated, and administered by the Corporation Commission, a constitutional agency of the State created by Okla. Const. Art 9 § 15.

¶ 25 We also examine the nature of the transaction that generated the funds at issue. For example, in *Moran v. State ex rel. Derryberry*, 1975 OK 69, 534 P.2d 1282, we examined the nature of the transaction that generated funds for the State Insurance Fund. We said, "It appears to be agreed, or

---

**13.** *Chandler U.S.A., Inc. v. Tyree*, 2004 OK 16, n. 1, 87 P.3d 598, 599 (change from State Insurance Fund to CompSource Oklahoma explained).

**14.** For example, the Legislature's power to alienate the state's ownership interest in state funds is subject to the state constitutional provision prohibiting a gift of state funds, and the Legislature may not create a gift by naming it something else. Okla. Const. Art. 10 § 15. In other words, the constitution prohibits a gratuitous transfer of the property of the state voluntarily and without consideration regardless of the stat-utory label attached to the transaction by the Legislature. *Childrens Home and Welfare Association v. Childers*, 1946 OK 180, 171 P.2d 613, 614; *Hawks v. Bland*, 1932 OK 101, 9 P.2d 720, overruled in part on other grounds, *Board of Commissioners of Marshall County v. Shaw*, 1947 OK 181, 182 P.2d 507. *See also In re Oklahoma Capitol Improvement Authority*, 2003 OK 59, ¶ 33, 80 P.3d 109, 129 (the Court examined the circumstances of transaction to determine if public funds were transferred in violation of Okla. Const. Art. 10 § 15).

conceded, that no State appropriation has ever been used by the State Insurance Fund." *Id.* 534 P.2d at 1285. We then noted that the Insurance Fund entered into contracts of insurance and received premiums as payment for the insurance issued.[15]

¶ 26 In the case before us, a mandatory assessment is made upon those required to pay the motor fuel tax. 17 O.S.Supp.2006 § 354(A). Do those required to pay the assessment receive consideration for their assessment payment similar to the employers purchasing insurance in *Moran*? Nothing in the Petroleum Storage Tank Release Indemnity Program shows such consideration. Additionally, § 354(A) describes the assessment as "precollected" in accordance with the Motor Fuel Tax Code. That Code imposes a tax that is "precollected" from the ultimate consumer and *not* those remitters required to make the tax payments to the Tax Commission. 68 O.S.2001 § 500.2(A) & (C).[16]

¶ 27 Phillips and the Commission argue that funds in the Indemnity Fund are not subject to appropriation by the Legislature for purposes other than the Indemnity Fund, and this proves the funds are not state funds. They regard the language in § 354(E)(1) that the funds "shall not become part of the general budget of the Commission or any other state agency" as a limitation on legislative action. We do not view this language as a limitation upon the Legislature. It is a well-known principle of statutory and constitutional construction that one Legislature cannot bind another.[17] Instead, the language lim-

its the actions of state officials charged with administering the Indemnity Fund and states how the funds in the Fund should be regarded for state budgetary purposes.

¶ 28 Money in the Indemnity Fund must be owned by someone, some entity. With the Corporation Commission, a constitutional agency of the State, administering those funds for the purposes required by the Petroleum Storage Tank Release Indemnity Program, the money in the Indemnity Fund belongs to the State of Oklahoma.

## II. The *Tal* Opinions

■ ¶ 29 Phillips and the Corporation Commission argue that dismissal of the taxpayers' *qui tam* action is required because of this Court's holdings in *City of Oklahoma City v. Oklahoma City Urban Renewal Authority*, 1999 OK 71, 988 P.2d 901 (*Tal I*), *State ex rel. Tal v. Norick*, 1999 OK 85, 991 P.2d 999 (*Tal II*), and related opinions. They argue that taxpayers had no right to prosecute an action on behalf of the state because the Corporation Commission brought a declaratory judgment action testing the validity of its agreement with Phillips. Taxpayers respond and argue that the Corporation Commission and Phillips are seeking to uphold the agreement via the declaratory judgment proceeding, and arguments against the agreement have not been advanced by the Corporation Commission for judicial review. Taxpayers argue that they should be allowed to intervene in the Commission's declaratory judgment proceeding

---

15. Additionally, the State Insurance Fund (CompSource Oklahoma) is an entity that possesses statutory authority to sue and be sued in state courts. *State ex rel. State Insurance Fund v. JOA, Inc.*, 2003 OK 82, ¶ 10, 78 P.3d 534. Phillips and the Corporation Commission point to no similar language indicating that the Indemnity Fund is an entity instead of a mere account owned by the state and managed by Commission and designated Commission employees.

16. Phillips and the Corporation Commission do not identify for whom the assessment is *precollected* by the fuel tax remitters, and they do not refer to the assessment as a "tax" as does the *amicus curiae* brief. We decline to *sua sponte* analyze the nature of the legislative power that was used to make the 17 O.S. § 354 assessment; that is, whether the power was an exercise of the legislature's power to tax, police power, or some

other power, and the resulting implications, if any, on the nature of the funds deposited in the Indemnity Fund. Thus, we need not determine if § 354 is a tax imposed upon the ultimate consumer that is precollected by motor fuel distributors, or the nature of the activities supported by payments from the Indemnity Fund.

17. For example, in *Terry v. Bishop*, 2007 OK 29, ¶ 12, 158 P.3d 1067, we said that "Our decision in *Granger* [*v. City of Tulsa*, 1935 OK 801, 174 Okla. 565, 51 P.2d 567] is consistent with the holding in *State v. Coyle*, 1912 OK CR 126, 7 Okla.Crim. 50, 122 P. 243 which recognized the fundamental constitutional principle that a legislative body may not irrevocably bind its successors." *See also Petition of University Hospitals Authority*, 1997 OK 162, ¶ 22, 953 P.2d 314, 329; *Davis v. Childers*, 1937 OK 728, 74 P.2d 930, 932.

and be allowed to prosecute a *qui tam* remedy.

¶ 30 In five recent opinions the Court discussed a taxpayer's demand upon a public body, the public body's response thereto by filing a declaratory judgment action, a taxpayer's response by seeking to intervene in the declaratory judgment proceeding, and the taxpayer's subsequent *qui tam* proceeding filed as a separate action.[18] Therein, although the parties to the declaratory judgment proceeding agreed that the public contracts at issue were lawful, such agreement did not deprive the declaratory judgment proceeding of its justiciable character when the issues presented were not feigned or collusive by those seeking to uphold the public contracts. *State ex rel. Moshe Tal v. City of Oklahoma City*, 2002 OK 97, ¶ 8, 61 P.3d 234, 241 (*Tal IV*), citing *City of Oklahoma City v. Oklahoma City Urban Renewal Authority*, 1999 OK 71, ¶ 29, 988 P.2d 901, 907 (*Tal I*).

¶ 31 In *State ex rel. Moshe Tal v. Norick*, 1999 OK 85, 991 P.2d 999 (*Tal II*), we concluded that a taxpayer *qui tam* proceeding was filed prematurely because a pending declaratory judgment proceeding was filed in response to the taxpayers' written demand. The Corporation Commission and Phillips make a similar argument. However, our conclusion in *Tal II* was based upon more than the mere fact that declaratory judgment proceeding had been filed. The record showed that the same claims of allegedly wrongful conduct were presented for adjudication in both the declaratory judgment proceeding and the subsequent *qui tam* proceeding. *Tal II*, 1999 OK 85, at ¶¶ 8–9, 991 P.2d at 1001.

¶ 32 In the *Tal* cases, we examined whether the facts and applicable law of the controversy were before the trial court for it to consider when adjudicating the merits of the controversy. The taxpayers argued that the facts and law were not before the trial court in the declaratory judgment proceeding and

that they should be allowed to intervene and press for *qui tam* relief. In *Tal I* the taxpayers claimed that the city's suit was non-responsive to the taxpayers' demand because the city failed to support the taxpayers' claims. 1999 OK 71, ¶ 18, 988 P.2d at 906. We held, correctly we think, that the city was not required to do so. *Id.* However, we distinguished between the taxpayers' factually unsupported conclusions which the city need not follow and facts material to the controversy that were required for the trial court to have before it to adjudicate the controversy.

¶ 33 When we rejected the taxpayers' argument that the city's suit was non-responsive, we relied upon *State, Bd. Com'rs Pontotoc County ex rel. Braly v. Ford*, 1941 OK 270, 116 P.2d 988. *Tal I*, at ¶ 17, 988 P.2d at 906. In *Braly* the taxpayers alleged that a county treasurer expended money from a sinking fund in an allegedly unlawful manner for certain securities. *Braly*, 116 P.2d at 989. The same day that the taxpayers' demand was made to the board of commissioners the board directed the county attorney to institute suit against the treasurer, and the county attorney immediately ordered an audit. *Id.* Prior to completion of the audit the taxpayers sued, and then upon the audit's completion the county attorney filed an action against the treasurer. *Id.* 116 P.2d at 989.

¶ 34 We stated that "diligence on the part of the proper officials in prosecuting the action after the statutory demand is a matter of defense against the taxpayer's [*qui tam*] action." *Braly*, 116 P.2d at 990. We also explained that public officials are presumed, in the absence of any showing to the contrary, to be ready and willing to perform their duties. *Id.* We affirmed the dismissal of the *qui tam* claim because "The evidence fully supports the court's finding that the officers had not failed to act diligently in instituting and presenting the suit on behalf

---

18. *City of Oklahoma City v. Oklahoma City Urban Renewal Authority*, 1999 OK 71, 988 P.2d 901 (*Tal I*); *State ex rel. Moshe Tal v. Norick*, 1999 OK 85, 991 P.2d 999 (*Tal II*); *State ex rel. Moshe Tal. v. City of Oklahoma City*, 2000 OK 70, 19 P.3d 268, *cert. denied*, 534 U.S. 814, 122 S.Ct. 40,

151 L.Ed.2d 13 (2001) (*Tal III*); *State ex rel. Moshe Tal v. City of Oklahoma City*, 2002 OK 97, 61 P.3d 234, (*Tal IV*); *Oklahoma City Urban Renewal Authority v. City of Oklahoma City*, 2005 OK 2, 110 P.3d 550, 554 (*Tal V*).

of the county." *Braly*, 116 P.2d at 992. In *Braly* the taxpayers' lack of a *qui tam* remedy was based upon the character of the officials' actions as shown by the evidence before the trial court.

¶ 35 In *Tal I* we also distinguished *State ex rel. Lockhart v. Board of Com'rs of Lincoln County*, 1946 OK 291, 173 P.2d 725, because in *Tal I* certain facts were before the trial court when it adjudicated the merits of the controversy, and no contrary facts were raised in the trial court in support of certain conclusory allegations raised in the written demand letter. *Tal I*, at ¶ 19, 988 P.2d at 906. For example, our discussion includes the following:

> Here the issue is much different from the issue involved in *Lockhart*. The case has been tried and the record developed supports the trial court's finding that the property at issue was sold at its fair market value and that the protections for the public to safeguard its interests spelled out in the Agreements were adequate. This ends the inquiry and T.A.R.'s [taxpayers'] expression of a contrary opinion in its Demand, without factual support, does not change the result.

*Tal I*, 1999 OK 71, ¶ 19, 988 P.2d 901.

In *Tal I* the taxpayers' possessed no right to intervene in the declaratory judgment proceeding where the controversy and the facts material to that controversy were before the trial court in a form that the trial court could consider when making its decision on the merits.

¶ 36 In explaining that a controversy was before the trial court, although the parties sought the same relief, we cited opinions from Wyoming, Idaho, and New Jersey. *Tal I*, at ¶¶ 25 –28, 988 P.2d at 907. In *Brimmer v. Thomson*, 521 P.2d 574 (Wyo.1974), although the actual litigants before the trial court held a similar view on the controversy, the opposing view was before the trial judge in the form of a previous attorney general's opinion, and the issue did not turn on an issue of fact. *Tal I*, at ¶¶ 25 –26, 988 P.2d at 907. See *Brimmer*, 521 P.2d at 577, where the court stated that "the matter of the controversy and adversity is presented by the attachment of Exhibit A, a copy of the

[attorney general's] opinion, to said complaint...." Similarly, in *State ex rel. Miller v. State Board of Education*, 56 Idaho 210, 52 P.2d 141 (1935), the controversy did not turn on an issue of fact, but on three questions of law. *Id.* 52 P.2d at 142. In *Whelan v. New Jersey Power & Light Company*, 45 N.J. 237, 212 A.2d 136, 139 (1965), the appellate court required the services of an *amicus curiae* at the expense of one of the parties to assure that "that all recesses of the problem will be earnestly explored" in presenting the issues. *Id.* 212 A.2d at 139.

¶ 37 The *Tal* opinions indicate that when a public body receives the written demand letter, one of the appropriate responses may be to bring a declaratory judgment proceeding to adjudicate the legality of the issues raised by the demand letter. The declaratory judgment proceeding may be deemed, as a matter of law, to be an appropriate response because officials are entitled to the presumption that their action in seeking declaratory judgment is in good faith. *State ex rel. Moshe Tal. v. City of Oklahoma City*, 2000 OK 70, ¶ 4, 19 P.3d 268, 271, *cert. denied*, 534 U.S. 814, 122 S.Ct. 40, 151 L.Ed.2d 13 (2001). In *State, Bd. Com'rs Pontotoc County ex rel. Braly v. Ford, supra*, one of the issues was the diligence of the officials in bringing an action after receiving a demand letter. *Braly*, 116 P.2d at 990–992. A recurring issue in the *Tal* opinions is similar, but not identical; *i.e.*, the diligence of the officials' representation of the alleged illegal official acts in the declaratory judgment proceeding. In the *Tal* cases, the taxpayers failed to show that the facts material to the legality of the issues were not presented to the trial court for it to consider when adjudicating the merits of the claimed legality or illegality. *Tal I* and *Tal II, supra*. For additional example, we specifically noted in *Tal IV* that the taxpayers failed to assert that the public body failed to raise any substantive issue arising from the allegations of the taxpayers' written demand upon the public body that related to the lawfulness of the challenged acts of the public body. *Tal IV*, 2002 OK 97, at ¶ 8, 61 P.3d 234, at 241.

¶ 38 The same diligence required of public officials we recognized in *Braly* is equally

applicable when the action brought by officials is seeking declaratory judgment in response to a demand letter. Of course, the officials may seek to judicially validate the conduct challenged by the taxpayers, and they are not required to repeat factually unsupported conclusory allegations from the taxpayers' demand letter. *Tal I*, 1999 OK 71, ¶ 18, 988 P.2d at 906. However, the officials' declaratory judgment proceeding must put before the trial court the substance of the taxpayers' material factual allegations showing illegality.

¶ 39 In the matter before us, whether Taxpayers' *qui tam* proceeding was premature is based upon the appropriateness of the officials' actions in response to the written demand. *Braly, supra.* Clearly, a declaratory judgment proceeding brought by officials in response to a demand letter is one of many procedurally appropriate responses. *Tal II, supra.* While officials are not required to adopt all of taxpayers' arguments and seek judicial invalidation of their previous actions, the officials' declaratory judgment proceeding must present the material facts of the controversy and applicable law before the trial court in a judicially cognizable form.

¶ 40 The Commission's petition for declaratory judgment states that a Settlement Agreement was reached with Phillips. It also states that a written demand letter was delivered to the Commission and the Commissioners and that the letter alleges that the Settlement Agreement permitted "the transfer of state environmental funds for claims which were '. . . known to be fraudulent or void, or in pursuance of any unauthorized, unlawful or fraudulent contract or agreement.' 62 O.S. § 372." The petition states that the taxpayers demanded that the Commission rescind the Settlement Agreement. The petition states that the demand letter "raised certain questions which need resolution" and an "actual controversy" has arisen because of the demand letter. The petition does not identify these questions. The Settlement Agreement is attached to the petition as an exhibit.

¶ 41 The declaratory judgment petition contains many allegations for the purpose of

showing that the Settlement Agreement should not be rescinded. The petition cites several statutes for the purpose of showing the Settlement Agreement is not invalid. It cites case law and statutes for an argument that the Indemnity Fund contains no state funds and that taxpayers' threatened *qui tam* action is improper. The petition contains allegations relating to circumstances leading up the Settlement Agreement, and why the Settlement Agreement should be considered advantageous to the state.

¶ 42 None of the facts relied upon by the taxpayers for showing illegality are in the declaratory judgment petition. The petition does not mention the allegation that the State Auditor and Inspector performed an audit of Phillips' claims, and that of the initial 3.9 million dollars paid approximately one million dollars was questioned by the State Auditor and Inspector as an overpayment. The petition does not mention the allegation that Phillips did not submit claims with statutorily required information for payment from the Indemnity Fund. The petition does not mention that many of the claims by Phillips had been previously denied by the Commission acting through certain employees, after which Phillips resubmitted these claims to different Commission employees who approved their payment via a settlement agreement.

¶ 43 Taxpayers make several allegations relating to ex parte meetings between representatives of Phillips and one of the Commissioners while administrative claims were pending, change in employees of the Commission, meetings of Phillips' representatives and a state senator, and other allegations all for the purpose of showing bad motives, or at least a motive other than one for payment of legitimate claims. An official's declaratory judgment proceeding need not put forward allegations of motive where motive is not an element of the taxpayer's alleged action showing an unauthorized, or unlawful, or fraudulent contract. But, as here, where taxpayers allege facts in support of statutory violations pertaining to payment of public funds, and allege facts from an audit by a government official charged with making audits of public funds, the officials must put

those facts before the trial court in a manner sufficient to give the defendant and the trial court fair notice of the nature of the controversy raised by a demand letter.

¶ 44 Two reasons require this result. First, a matter is proper for declaratory relief only when an actual justiciable controversy is presented for adjudication. *Cherokee Nation v. Nomura*, 2007 OK 40, n. 9, 160 P.3d 967. Second, the procedure for presenting a justiciable controversy is to present material facts and law to the trial court by pleading and evidence. For example, we recently stated the following.

> We have stated that declaratory relief is based upon the existence of a justiciable controversy. *City of Oklahoma City v. Oklahoma City Urban Renewal Authority*, 1999 OK 71, ¶ 28, 988 P.2d 901, 907; ·*Ethics Commission v. Cullison*, 1993 OK 37, 850 P.2d 1069, 1073. The term "justiciable" refers to a lively case or controversy between antagonistic demands. *Lawrence. v. Cleveland County Home Loan Authority*, 1981 OK 28, 626 P.2d 314, 315. When a party presents antagonistic demands that are merely speculative a prohibited advisory opinion is being requested. *State ex rel. Oklahoma Capitol Imp. Authority v. E.A. Cowen Const. Co.*, 1974 OK 4, 518 P.2d 1264, 1266; *Post Oak Oil Co. v. Stack & Barnes, P.C.*, 1996 OK 23, 913 P.2d 1311, 1314.

*House of Realty, Inc. v. City of Midwest City*, 2004 OK 97, ¶ 12, 109 P.3d 314, 318. The material facts.and law relied on by the taxpayers in their written demand provide the "antagonistic demands" that are before the trial court in an officials' declaratory judgment proceeding, although the actual relief sought may be to judicially validate the officials' prior action that is challenged by the taxpayers. These antagonistic demands show that the officials' declaratory judgment request is not a prohibited advisory opinion.

¶ 45 The material facts in the written demand *may* be, but are not required to be, quoted verbatim in the officials' petition for declaratory relief. This is so because notice pleading does not require pleading every fact upon which a claim is based, but merely a short and plain statement of the claim that will give fair notice of what the plaintiff's claim is and the grounds upon which it rests.[19] Merely pleading that a controversy exists without mentioning any of the facts relied on by the taxpayers in alleging an unlawful agreement does not provide the trial court with sufficient facts to identify an actual controversy to adjudicate. Where the legality of officials' conduct turns on a question of law, as in *Brimmer v. Thomson, supra*, the officials are to inform the trial court of the nature of that dispute; and when the legality of officials' conduct turns on a question of fact, those facts must be before the trial court in such form that the trial court can consider them when adjudicating the merits of the petition for declaratory judgment.[20]

¶ 46 In summary, officials may use a declaratory judgment proceeding for the purpose of testing the legality of their prior actions after they have been challenged by a taxpayer's written demand. However, the procedural vehicle of declaratory relief has a substantive standard as well; it must include, at a minimum, a short and plain statement of the taxpayer's challenge that will give fair notice of the nature of the controversy that the trial court is being requested to adjudicate. In the matter before us the declaratory judgment petition and answer did not contain the taxpayers' demand letter or otherwise plead the nature of the taxpayers' challenge to the settlement agreement. The declaratory judgment request by the officials is insufficient to make taxpayers' *qui tam*

---

**19.** *Estate of Hicks ex rel. Summers v. Urban East, Inc.*, 2004 OK 36, ¶ 15, 92 P.3d 88, 92; *Delbrel v. Doenges Bros. Ford, Inc.*, 1996 OK 36, ¶ 3, 913 P.2d 1318, 1320. *See also Fanning v. Brown*, 2004 OK 7, ¶ 20, 85 P.3d 841, 847–848, quoting, *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit et al*, 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993)

(discussing similar principle in the Federal Rules of Civil Procedure).

**20.** Because this matter involves the adequacy of pleading we need not address the officials' burden to present material facts relating to taxpayers' claim in the context of evidentiary materials.

petition premature. *Tal I, supra,* and *Tal II, supra.*

## III. The *Qui Tam* Petition, Intervention, and Remand

¶ 47 Phillips and the Corporation Commission argue on certiorari that the Court of Civil Appeals incorrectly construed their motions to dismiss as motions for summary judgment when they challenged taxpayers' *qui tam* petition. Taxpayers responded to the motions to dismiss with a response containing attached materials outside of the pleadings. The replies by the Commission and Phillips did not include materials outside of the pleadings.[21] The appellate court construed the motions as motions for summary judgment because of the materials attached to taxpayers' responses.

¶ 48 This Court has consistently stated that a motion to dismiss for failure to state a claim upon which relief may be granted, as provided by 12 O.S.2001 § 2012(B)(6), is to be treated as a motion for summary judgment when matters outside of the pleadings are presented in support of the motion and those extra-pled matters are not excluded by the trial court when the motion is considered. *Kordis v. Kordis,* 2001 OK 99, ¶¶ 1–3, 37 P.3d 866, 868–869; *Dyke v. Saint Francis Hospital, Inc.,* 1993 OK 114, 861 P.2d 295, 298–299. Of course, once the motion to dismiss is converted to one for summary judgment the moving party has a different burden: "Once the proceeding becomes one for summary judgment, the moving party's burden changes and he is obliged to demonstrate that there exists no genuine issue as to any material fact and that he is entitled to a judgment as a matter of law." *Shaffer v. Jeffery,* 1996 OK 47, 915 P.2d 910, 914, quoting, 5A Wright & Miller, *Federal Practice and Procedure: Civil 2d,* § 1366 (1990). *See also Cinco Enterprises, Inc. v. Benso,* 1994 Ok 135, 890 P.2d 866, 871; *Indiana Nat.*

*Bank v. State, Dept. of Human Services,* 1993 OK 101, 857 P.2d 53, 59. It is of this change of the burden that Phillips and the Commission complain. They want to challenge the legal sufficiency of the petition without seeking judgment on the merits as a matter of law.

¶ 49 Title 12, section 2012(B) provides in part:

> If, on a motion asserting the defense numbered 6 of this subsection to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and all parties shall be given reasonable opportunity to present all material made pertinent to the motion by the rules for summary judgment.

12 O.S. Supp.2006 § 2012(B).

This language treats a motion to dismiss based upon a failure to state a claim upon which relief may be granted as a motion for summary judgment when matters outside the pleading are presented to, and not excluded by, the trial court.

■ ¶ 50 The substance of a motion requesting judicial relief, rather than the motion's title, is determinative of the relief requested from the court. *Horizons, Inc. v. Keo Leasing Co.,* 1984 OK 24, 681 P.2d 757, 759; *Deen v. Fruehauf Corp.,* 1977 OK 27, 562 P.2d 505, 506. When the movant has challenged the facial sufficiency of a petition and not relied upon matters outside the pleadings in either movant's motion or movant's replies to an opposing party's responses on the motion, it makes little sense to convert the motion to one for summary judgment when its content is not seeking summary judgment.

---

21. The Corporation Commission's response to an *amicus curiae* brief filed by an Assistant Attorney General has attached thereto a brief purportedly filed by the same Asst. A.G. in a different case on the criminal docket in the same district court. The issue addressed by the extra-record brief is the nature of state funds. This Court will not treat a motion to dismiss as one for summary judgment where the parties were neither put on notice of the action nor given an opportunity to present applicable material. *Estes v. Estes,* 1996 OK 79, 921 P.2d 346, 349. The attached extra-record brief was for the purpose of challenging the facial sufficiency of the *qui tam* petition, and the brief did not create notice for a summary judgment request. The Commission's response to the amicus brief did not convert its motion to one for summary judgment.

¶ 51 In the case before us, the taxpayers attached affidavits to their responses to the motions to dismiss. If their petition lacked facts, they could certainly amend it. No responsive pleading had been filed by the Commission or Phillips, and pursuant to 12 O.S.2001 § 2015(A) [22] a petition may be amended *by right* at any time before an answer is served. *Winston v. Stewart & Elder, P.C.,* 2002 OK 68, ¶ 24, 55 P.3d 1063, 1072. We see no purpose in allowing a plaintiff to unilaterally change a movant's motion to one for summary judgment and thus require the movant to meet a different burden than when challenging the sufficiency of the petition. Language to the contrary in *Tisdale v. ITW Ramset/Red Head,* 2003 OK CIV APP 83, ¶ 4, 77 P.3d 609, 610, and *Benson v. Hunter,* 2002 OK CIV APP 44, ¶¶ 5–7, 45 P.3d 444, 445, is hereby disapproved.

¶ 52 The function of a motion to dismiss is to test the law of the claims, not the facts supporting them. *Estate of Hicks ex rel. Summers v. Urban East, Inc.,* 2004 OK 36, ¶ 5, 92 P.3d 88. "The applicable test for appraising the sufficiency of a pleading challenged for failure to state a claim upon which relief may be granted teaches that *no dismissal* may be effected unless it should appear *beyond doubt* that the plaintiff can prove no set of facts in support of the claim which would entitle her to relief." *Dyke v. Saint Francis Hospital, Inc.,* 1993 OK 114, 861 P.2d 295, 298 (note omitted).

¶ 53 We stated the following in a previous *qui tam* proceeding where the sufficiency of a petition was challenged:

We have no doubt that an allegation to the effect that county officials charged with the responsible duties of disposing of real estate held by the county by purchase at resale, knowingly caused same to be transferred to one at a small fraction of its true value as known to them, is sufficient to state a prima facie case of fraud and is sufficient to withstand a demurrer directed at the sufficiency of the petition to state a cause of action.

*State ex rel. Lockhart v. Board of Com'rs of Lincoln County,* 1946 OK 291, 173 P.2d 725, 727.

¶ 54 In *Lockhart* the allegation was simply that the officials had transferred public property for a small fraction of its true value. We concluded that the petition was sufficient to withstand a challenge to its sufficiency in stating a cause of action. In the present matter the allegations include but are not limited to (1) that state funds were paid upon claims that the officials knew were not legally due because of insufficient information supplied by Phillips, (2) that an audit by the State Auditor and Inspector had informed officials that payment had been made without authority, and (3) that officials had been coerced to make payments that were not authorized by law. As in *Lockhart,* we have no doubt that the allegations are sufficient to withstand a § 2012(B)(6) challenge.

¶ 55 In this case, the taxpayers sought to intervene in the declaratory judgment proceeding and sought review on appeal of the trial court's order denying their motion to intervene. In *Tal II, supra,* we said that taxpayers had no right to intervene because the controversy was properly presented to the trial court by the actions of the officials after the demand letter. In the matter before us, the taxpayers claim a right to intervene.

¶ 56 The Pleading Code makes timely intervention a matter of right [23] when there is

22.  12 O.S.2001 § 2015(A):
A. AMENDMENTS. A party may amend his pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, he may so amend it at any time within twenty (20) days after it is served. Amendments to add omitted counterclaims or to add or drop parties may be made as a matter of course within the time specified above. Otherwise a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires. A party shall respond to an amended pleading within the time remaining for response to the original pleading or within ten (10) days after the service of the amended pleading, whichever period may be longer, unless the court otherwise orders.

23.  Title 12, Section 2024, provides in part:

A. INTERVENTION OF RIGHT. Upon timely application anyone shall be permitted to intervene in an action:

either an unconditional statutory right to intervene; or when (1) the intervenor claims a significant protectable interest relating to the property or transaction that is the subject of the action, (2) the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest, and (3) the existing parties may not adequately represent the applicant's interest. *See Brown v. Patel*, 2007 OK 16, ¶¶ 16–18, 157 P.3d 117, 123–124. The parties focus on the nature of the interest claimed by the taxpayers in this controversy.

¶ 57 In *State, Bd. Com'rs Pontotoc County ex rel. Braly v. Ford*, 1941 OK 270, 116 P.2d 988, we stated that when the officials fail to take the proper actions after a taxpayer's statutorily sufficient written demand, a "taxpayer may institute a suit as provided by the statute and thereby acquire a substantial interest in the subject matter of the litigation." *Id.* 116 P.2d at 990. But because of the presumption that officials will take proper actions subsequent to a demand letter, the taxpayer's interest does not come into being until the taxpayer shows that officials failed to take the proper actions after receiving the demand letter. *Id.* 116 P.2d at 990–991.

¶ 58 The *qui tam* interest of taxpayers is thus limited to that created by the *qui tam* statute. Taxpayers must show the insufficiency of the declaratory judgment petition as a condition precedent to a successful intervention in the declaratory judgment proceeding. The motion to intervene argues that intervention is necessary to put before the trial court the facts of the controversy

that were not raised by the declaratory judgment proceeding. Taxpayers showed the insufficiency of the allegations of the declaratory judgment petition for the purpose of intervening to present the facts of the controversy to the trial court for its consideration on the merits of the controversy.[24]

¶ 59 Another argument raised on certiorari is that the taxpayers improperly sought intervention for the purpose of dismissing the declaratory judgment petition. Taxpayers stated that if they were allowed to intervene they would seek dismissal of the officials' petition. Taxpayers made various allegations against the petition, including that the Corporation Commission did not authorize the declaratory judgment proceeding and that the declaratory judgment proceeding was not brought in good faith. Phillips and the Commission argue that public officials are presumed to act in good faith and, because of that presumption, taxpayers may not seek to intervene to challenge a declaratory judgment petition filed in response to a taxpayers' demand letter.

¶ 60 The argument of Phillips and the Commission is based upon the unstated premise that the good-faith presumption of public officials in presenting the taxpayer controversy to a court is an irrebuttable or conclusive presumption, and thus the attempt to intervene is barred as a matter of law. An irrebuttable, conclusive, or absolute presumption is a rule of law that once the averment is shown it may not be overcome by any proof that the fact is otherwise.[25] While

1. When a statute confers an unconditional right to intervene; or
2. When the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest.

24. We have not been requested to decide in these appeals whether intervention by taxpayers for the purpose of seeking the *qui tam* remedy is appropriate when a declaratory judgment proceeding insufficiently presents the nature of *qui tam* the controversy. We have recently concluded that an officials' declaratory judgment proceeding and taxpayers' *qui tam* relief request may be based upon the same transaction or occurrence; *i.e.*, the same cause of action. *Okla-*

*homa City Urban Renewal Authority v. City of Oklahoma City*, 2005 OK 2, ¶¶ 15–16, 110 P.3d 550, 554. Similarly, we have not been requested to determine taxpayers' right to intervene simply as taxpayers seeking equitable relief for an alleged illegal expenditure of public funds. *See, e.g., Oklahoma Public Employees Association v. Oklahoma Department of Central Services*, 2002 OK 71 ¶ 10, 55 P.3d 1072, 1078 ("... a taxpayer possesses standing to seek equitable relief when alleging that a violation of a statute will result in an illegal expenditure of public funds...."). Thus, we make no pronouncement on how these two opinions would, or would not, apply to taxpayers' motion to intervene.

25. *Mistletoe Express Service v. United Parcel Service*, 1983 OK 27, 674 P.2d 1, 7; *Black's Law Dictionary*, 1349 (4th ed.1951) (defining pre-

irrebuttable presumptions are often disfavored by courts,[26] there are some circumstances where the interests of parties are properly subject to irrebuttable presumptions. For example, in *David V.R. v. Wanda J. D.*, 1995 OK 111, 907 P.2d 1025, we explained that an irrebuttable presumption of the paternity of a child born during marriage barred the putative father's suit because of important and overriding public and social policies.

¶ 61 In *Tal IV* we stated that the taxpayers failed to overcome the presumption that the City would act in good faith in presenting the controversy in the declaratory judgment proceeding. *State ex rel. Moshe Tal v. City of Oklahoma City*, 2002 OK 97, ¶ 8, 61 P.3d 234, 241. We did not hold that the taxpayers were barred from presenting evidence and making legal arguments for the purpose of overcoming the presumption. The taxpayers in the controversy before us are challenging not only the sufficiency of the declaratory judgment petition in presenting the nature of the controversy so as to show the propriety of their quest for seeking *qui tam* relief, but also that the entire declaratory judgment proceeding was improperly brought and tainted by a lack of good faith on the part of the officials involved. While we have concluded that the allegations of the declaratory judgment petition are insufficient to present the taxpayer's controversy so as to bar their seeking *qui tam* relief, we expressly do not determine whether the allegations of taxpayers' motion to dismiss attached to their motion to intervene are sufficient either factually, or as a matter of law, to dismiss a declaratory judgment petition brought by officials in response to a taxpayers' written demand.[27]

¶ 62 In *State, Bd. Com'rs Pontotoc County ex rel. Braly v. Ford*, 1941 OK 270, 116 P.2d 988, the *qui tam* taxpayers were allowed to present evidence on the issue of whether the officials acted in good faith, although they ultimately failed to meet their evidentiary burden. *Braly*, 116 P.2d at 992. Phillips and the Commission have not pointed to *any* overriding public and social policies mandating that taxpayers should be barred from having an opportunity to present evidence and legal argument that public officials have not acted in good faith in response to a taxpayer's written demand. We hold that the presumption is not irrebuttable and may be challenged by *qui tam* plaintiffs.

¶ 63 In one appeal we have concluded that the trial court's order sustaining the motion dismissing the *qui tam* petition was error and must be reversed. In another appeal we have concluded that the trial court's order denying the motion to intervene was error and must be reversed. The orders reversed are on appeal from two different trial court cases. We limit our appellate review to the claims made on certiorari, reverse both orders appealed from the trial court, and remand the causes to the trial court for further proceedings consistent with this opinion.

¶ 64 EDMONDSON, V.C.J., HARGRAVE, KAUGER, WATT, TAYLOR, COLBERT, JJ., concur.

¶ 65 OPALA, J., concurring in result in Part I of the court's opinion and concurring in its remainder

No literal meaning can ever be ascribed to a statutory declaration that is in patent discord with legal reality and its consequences. Instead of attributing to the statute's words an intention of effecting an

---

sumption); *Tevolini v. Tevolini*, 66 Conn.App. 16, 783 A.2d 1157, 1166.

**26.** *See, e.g., Vlandis v. Kline*, 412 U.S. 441, 446, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973) ("Statutes creating permanent irrebuttable presumptions have long been disfavored under the Due Process Clauses of the Fifth and Fourteenth Amendments."); *Mistletoe Express Service v. United Parcel Service*, 1983 OK 27, 674 P.2d 1, 7 ("[I]t is held to be a denial of due process to legislatively mandate an irrebuttable presumption of a fact, when that presumption is not necessarily or uni-

versally true in fact, and when the State has reasonable alternative means of making the crucial determination.").

**27.** The latter issue raises issues of fact and law that have not been adjudicated by a trier of fact and are not before us in these appeals. This Court, in the exercise of its appellate jurisdiction, does not make first-instance determinations of disputed issues of either law or fact. *Baker v. Saint Francis Hospital*, 2005 OK 36, ¶ 8, 126 P.3d 602.

unlawful divestiture of public money, we will, as we must, interpret them as no more than impressing the entire fund with a trust dedicated to the purpose for which it was created, permitting no diversion to anything else. When the statute's text is so understood, the title to the fund remains unchanged, but its assets, now firmly committed to a single purpose, stand impervious to legislative tinkering.[1]

¶ 66 WINCHESTER, C.J., Disqualified.

1. A long-standing "rule of statutory construction is that the manifest intent of the legislature will prevail over the literal import of words." *De–*

*Annexation of Certain Real Property from the City of Seminole,* 2004 OK 60, 102 P.3d 120, 129.